UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

In re      )
     )
SHERWOOD INVESTMENTS      )     Case No.  6:10-bk-00584-KSJ
OVERSEAS LIMITED, INC.,      )     Chapter 7
     )
    Debtor.      )
     )

SHERWOOD INVESTMENTS      )
OVERSEAS LIMITED, INC.,      )
     )
    Plaintiff,      )
vs.      )     Adversary No. 6:10-ap-00158-KSJ
     )
THE ROYAL BANK OF SCOTLAND      )
N.V., f/k/a ABN AMRO BANK N.V.,      )
     )
    Defendant.      )
     )

### *PROPOSED*[1] **MEMORANDUM OPINION**
### GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

#### TABLE OF CONTENTS

Introduction ........................................................................................ 2

The Parties' Relationship before September 2008 ........................................ 3

Events of September 2008 ......................................................................... 8

Sherwood's Implied-in-Fact Contract Claims Fail (Counts I–IV) ............... 14

The Independent Tort Doctrine Bars Sherwood's Tort Claims .................... 22

Conversion (Count X) ............................................................................. 23

Fraudulent and Negligent Misrepresentation (Counts VII and VIII) ............ 24

---

[1] This Proposed Memorandum Opinion is rendered under 28 U.S.C. § 157(c)(1) and Federal Rule of Bankruptcy Procedure 9033. *See* Notice Transmitting Proposed Orders and Order Setting Schedule for Objections and Responses, entered simultaneously.

No Fiduciary Relationship Existed between RBS and Sherwood
  (Counts V and IX)................................................................................29

Professional Negligence (Count VI)...........................................................32

The Presumption against Extraterritorial Application of Federal
  Statutes Bars Recovery of Sherwood's Fraudulent Transfer
  Claims (Counts XII and XIII)................................................................33

Unjust Enrichment (Count XI)....................................................................42

Sherwood's Experts Used the Wrong Standard to Measure
  of Damages ...........................................................................................44

Sherwood's Lost Profit Damages are Speculative and Inadmissible.............51

Conclusion ................................................................................................62

Defendant, The Royal Bank of Scotland N.V. ("RBS")[2], financed complex derivatives trading for the Plaintiff and Debtor, Sherwood Investments Overseas Limited, Inc. ("Sherwood") from 2006, until the onset of the stock market meltdown in September 2008. Sherwood seeks lost profit damages of up to $209 million due to RBS's alleged misconduct at the end of their trading relationship. RBS now seeks summary judgment on all of the Plaintiff's 13 legal theories. Finding no disputed material fact, summary judgment is entered in favor of RBS and against Sherwood.

Sherwood's Complaint raises 13 counts against RBS.[3] Counts I through IV assert RBS' breach of an alleged implied contract between the parties. Counts V through X assert various tort causes of action directed at RBS's conduct during September 2008. Counts XI through XIII focus on a two transfers Sherwood made to RBS that Sherwood alleges is fraudulent, unjustly enriched RBS, or was converted by RBS.  RBS asserts it is entitled to summary judgment on all these counts and also challenges Sherwood's lost damages calculation and its expert reports, arguing they used the wrong methodology and are too speculative.

---

[2] RBS is successor-in-interest to ABN AMRO Bank N.V.
[3] Doc. No. 1.

RBS moves for summary judgment[4] under Federal Rule of Civil Procedure 56.[5] Rule 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[6] The moving party has the burden of establishing the right to summary judgment.[7] A "material" fact is one that "might affect the outcome of the suit under the governing law."[8] A "genuine" dispute means that "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[9] Once the moving party has met its burden, the nonmovant must set forth facts showing there is a genuine issue for trial.[10] In determining entitlement to summary judgment, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."[11]

### The Parties' Relationship Before September 2008

Sherwood's claims arise out of the abrupt end of its trading relationship with RBS that had started over two years prior to September 2008. Sherwood would speculate on stocks through risky derivative instruments crafted by RBS. Sherwood also owned a subsidiary, Sherwood Farms, which operated as a commercial orchid farm in Central Florida.[12]

---

[4] The parties filed the following summary judgment documents: Defendant's Motion for Summary Judgment, Doc. No. 209; Materials in Support of Defendant's Motion for Summary Judgment, Doc. No. 208; Plaintiff's Opposition to Defendant's Motion for Summary Judgment, Doc. No. 223; Notice of Filing Deposition of Richard Freeman, Doc. No. 222; Notice of Filing Affidavit of Julian Benscher, Doc. No. 224; and Defendant's Reply to the Plaintiff's Response, Doc. No. 227.

[5] Fed. R. Civ. P. 56, made applicable to adversary proceedings by Fed. R. Bankr. P. 7056.

[6] Fed. R. Civ. P. 56(a).

[7] *Fitzpatrick v. Schlitz (In re Schlitz)*, 97 B.R. 671, 672 (Bankr. N.D. Ga. 1986).

[8] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986); *FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1307 (11th Cir. 2011).

[9] *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510.

[10] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 10 S. Ct. 1348 (1986).

[11] *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007).

[12] Sherwood Farms also filed for bankruptcy relief. *See* Case No. 6:10-bk-00578-KSJ.

RBS created these derivative instruments, called Mini-Long Certificates ("Certificates"),[13] and pegged the price of each Certificate to the value of other stocks (the "Underlying Stock"), usually a U.S. small-cap stock ("Single Stock Certificates") or a bundle of different stocks ("Dynamic Basket Certificates"). Sherwood's authorized representative, Julian Benscher, directed all of Sherwood's trading and selected the stocks Sherwood included in each purchase. The Certificates provided a mechanism for Sherwood to borrow money from RBS to speculate on securities with great leverage, similar to margin trading. But, in practice, the Certificates' features are even more complicated.

For every Certificate, RBS financed 75%-80% of the Underlying Stock's price (the "Financing Level"), and Sherwood paid RBS the remaining 20%-25%. Each Certificate had a stop-loss level[14] set above the Financing Level. A stop-loss is a common feature in securities trading to limit risk: when a security's price falls below the stop-loss level, the broker, here RBS, sells the security. Here, when the Underlying Stock's market price fell below the stop-loss level, a Certificate was said to have "knocked out" or terminated.[15] RBS, which had purchased shares of the Underlying Stock to hedge its loan to Sherwood, would sell these shares, recoup its

---

[13] The Terms and Conditions for the Certificates described them as follows: "Mini Long certificates are similar to ordinary certificates, in that they track in a linear manner the underlying asset(s). The difference between a Mini Long certificated and an ordinary certificated is that in the case of the Mini Long certificate, the amount needed to invest to give the same participation rate in the underlying asset(s) is considerable less. Therefore, the percentage gain if the underlying asset(s) rises is much higher in Mini Long certificates than normal certificates. This is the leverage effect." Terms and Conditions to Rentech Certificates Issued August 15, 2008, Freeman Decl. Ex. C, Doc. No. 208-1 at 48 of 87.

[14] A "stop-loss" or a stop order is:
> [A] direction given by the purchaser or seller, as the case may be, to his broker, to the effect that, if the commodity on the market touches the price named, the broker shall close the trade by selling or buying, as the case may be, at the best available price. It may not be possible for the broker, when the price has reached the "stop" figure, to close out at that price, but he must do the best he can at that moment. It is a measure of protection which the operator provides for himself against loss beyond a certain point in a fluctuating market, and it is the duty of the broker who accepts a contract under such conditions to comply with the instructions.

*Alexas v. Post & Flagg*, 129 S.C. 53, 123 S.E. 769, 769-70 (1924). *See also* 12 Am. Jur. 2d Brokers § 190.

[15] Bayley Dep. 71–75, Oct. 21, 2013, Doc. No. 208-21.

financing costs plus interest, and pay Sherwood the difference between the stop-loss level and the Financing Level, if any. An example may help explain this complicated trading relationship.

Assume Stock A's price is $4.90/share. Sherwood paid $1.00/share and borrowed $3.90/share from RBS to fund a Certificate. The stop-loss level was $4.30/share. The Financing Level initially would be $3.90/share but would increase over time as interest accrued. If the stock's market price fell below $4.30, the Certificate "knocked out" and terminated.[16] RBS then would sell its underlying hedge stock for $4.25/share, when the Financing Level was $3.95/share. RBS would retain its financing amount from the sale of the hedge stock and pay Sherwood the difference, $0.30/share.

The stock's price in this example went down, and Sherwood took a loss. RBS however still made a modest gain in interest charges. If, instead, the market price increased to $5.95/share, and Sherwood exercised the Certificate, then RBS would owe Sherwood the difference between the "Final Reference Price" ($5.95) and the financing level ($3.95). The Certificate's value to Sherwood then would be $2.00/share—a 100% increase from its initial investment of $1.00/share. Sherwood could cash out this gain with RBS and move into a Certificate with a higher stop-loss level.[17]

RBS hedged any loss from its loan to Sherwood caused by the potential increase of the Certificate value by purchasing shares of the Underlying Stock.[18] If the security increased in value—causing RBS to owe money to Sherwood if the Certificate was exercised—RBS could sell the underlying stock, which would have increased in value along with the Certificate, to pay

---

[16] The "price" of the stock was determined by RBS and was called the "Final Reference Price".

[17] In some instances, RBS had "investable" Certificates available when the value of the Underlying Stock increased and eliminated the need for RBS to create new Certificates through Euroclear, their clearing agent. Certificates remained investable when Sherwood moved out of them into Certificates with higher stop-loss levels. Bayley Dep. 73–75, Doc. No. 208-21.

[18] Freeman Dep. I at 104–06, October 5, 2012, Doc. No. 223-12.

Sherwood. RBS simultaneously earned interest on the financing it provided to Sherwood. Sherwood obtained large amounts of leverage and the potential to reap great gains. Concomitantly, Sherwood carried enormous risk in these transactions.[19]

Each Certificate had a term sheet and a prospectus, detailing the instrument's features and operation.[20] According to RBS's corporate representative Richard Freeman,[21] the prospectus was "the governing document that define[d] the payoff products" and was filed with the clearing agent, Euroclear, "when an instrument was traded."[22] "It define[d] the law under which the product [was] traded and the requirements and expectations that go with that."[23] The prospectus was filed with Euroclear.  The client rarely received a copy.[24] RBS usually sent the term sheet, a short form of the prospectus, to the client.[25]

From 2006 until mid-September 2008, whenever a Certificate "knocked out," RBS gave Sherwood the opportunity to "roll"[26] its investment. Rolling allowed RBS and Sherwood to create a new Certificate with a new stop-loss level and Financing Level. Sherwood would "roll" whatever amount it was due from the termination of the former Certificate into the new Certificate, and RBS would again finance most of the transaction. In betting parlance, rolling is similar to keeping all of your winnings on "red."   Sherwood still would owe to RBS its

---

[19] The Terms and Conditions of each Certificate even warned of this great risk: "Investors should be aware that the leverage effect from holding Mini Long certificates could result in gaining or losing a greater percentage of the investment than would occur through a direct investment in the underlying asset(s). The maximum loss to the investor is the initial amount invested. Investors must expect to suffer a loss if the market price/value of the underlying asset(s) falls." Terms and Conditions to Rentech Certificates Issued August 15, 2008, Freeman Decl. Ex. C, Doc. No. 208-1 at 48 of 87.

[20] Freeman Dep. I at 92, Doc. No. 208-12. Sample prospectuses are located at Exhibits 7 & 8 to Doc. No. 223. Examples of the operative term sheets sent by RBS to Benscher are located at Doc. No. 208-1 at 42–50.

[21] Richard Freeman was, at all relevant times, RBS's "global head of retail trading." Freeman Dep. II at 8, Oct. 30, 2013, Doc. No. 222-1.

[22] Freeman Dep. II at 48, Doc. No. 222-1.

[23] *Id.*

[24] Freeman Dep. I at 92, Doc. No. 208-12; Freeman Dep. II at 48–49, Doc. No. 222-1. The clearing agent issued the ISIN number for each new Certificate, in effect creating the security.

[25] Freeman Dep. II at 49–50, Doc. No. 222-1.

[26] *See generally* Bayley Dep. 71–76, Doc. No. 208-21. "Rolling" also is referred to as restriking in some of the parties' filings.

additional 20-25% contribution needed to fully settle the trade (the "Settlement Amount"). If Sherwood rolled a Certificate after a "knock out," Sherwood then would hold a new Certificate with a lower stop-loss level. RBS continued to earn interest and avoided the transaction costs associated with unwinding its hedge positions each time a Certificate terminated.

Sherwood was never a formal client of RBS because Sherwood did not meet RBS's risk management criteria.[27] But, in the wild trading days of 2006-2008, the parties found a workaround that made an already complicated trading relationship even more complex.  RBS required Sherwood to operate through an approved counterparty—UBS, a Switzerland-based bank. When Sherwood and RBS wanted to execute a trade, RBS would prepare and send "Instructions" containing the details of the trade first to Sherwood and, if approved, second to UBS.[28] UBS then would pay the required Settlement Amount from monies in Sherwood's accounts maintained at UBS. The Instructions' settlement terms were usually on a T+2 or T+3 basis, meaning UBS would pay settlement to RBS (on behalf of Sherwood, with Sherwood's funds) two or three days after the trade.[29]

Sherwood maintained three accounts at UBS. The first account was unencumbered and belonged solely to Sherwood. Sherwood managed the monies in the remaining two accounts on behalf of third parties, the Pentagon entities: Pentagon Bernini and Pentagon Hercules (collectively, "Pentagon"). The second of Sherwood's UBS accounts was pledged to Pentagon Bernini ("Pledged 2 Account"), and the third was pledged to Pentagon Hercules ("Pledged 3 Account"). Sherwood could not authorize UBS to transfer monies from the pledged accounts without the consent of Pentagon.

---

[27] *See* Freeman Dep. I at 41–46, Doc. No. 208-12.
[28] Freeman Dep. I at 123-124, Doc. No. 208-12; Freeman Dep. II at 45–46, Doc. No. 222-1.
[29] Freeman Dep. I at 123–124, Doc. No. 208-13; Bayley Dep. 109–10, Doc. No. 208-21.

Because RBS did not take Sherwood on as a formal client, their relationship was not governed by RBS's standard "Terms of Business" or any written agreement. The parties' business relationship was dictated by their course of conduct and, as Sherwood argues, by implied contractual obligations. The key aspect of this alleged implied contractual relationship is the "rolling" feature where RBS would permit Sherwood to roll terminated Certificates into new Certificates, upon payment of the new Settlement Amount. Sherwood argues RBS was contractually obligated in perpetuity to give Sherwood the opportunity to roll its investments into new Certificates. And, the course of conduct between the parties shows that RBS consistently allowed Sherwood to roll terminated Certificates into new ones until the global financial market collapsed in September 2008. The primary issue in this adversary proceeding is whether RBS is liable to Sherwood for refusing to allow Sherwood to continue the "rolls."

### Events of September 2008

Sherwood's claims arise out of events that occurred during a two-week period beginning September 15, 2008—the day after the collapse of Lehman Brothers. Sherwood then held two sets of Certificates—the Rentech Certificates and the Dynamic Basket Certificates.[30] The Dynamic Basket Certificates breached their stop-loss level on **September 15, 2008**.

Over the next few days, Benscher had several conversations with his normal trader at RBS, Michael Bayley, who was in New York on business, and Richard Langdon, the RBS agent covering Bayley's desk in London. On **September 16, 2008**, Benscher agreed to "roll everything over and we'll figure it out tomorrow."[31] Langdon asked Benscher to put Sherwood's directions

---

[30] Freeman Decl. ¶ 30, Doc. No. 208-1; Freeman Dep. I at 231–34, Doc. No. 208-13; Freeman Dep. I Ex. 50, Doc. No. 208-15 at 116.
[31] Doc. No. 223 Ex. 13.

into written instructions.  Benscher complied and provided the written instructions in an instant messaging chat stating, "I agree to roll the lot."[32]

On **September 17, 2008**, Sherwood agreed to roll its Dynamic Basket investment into pre-existing Certificates with a lower stop-loss level of 59.5.[33] Sherwood acquiesced, at RBS's insistence, to roll into previously existing Certificates instead of waiting the 5-day period for Euroclear to issue a new certificate number. During these negotiations, the Rentech Certificates also "knocked out."

Bayley prepared and sent Benscher the Term Sheet for the two rolls that now encompassed both the Dynamic Basket roll and the Rentech roll.[34] Benscher quickly gave his approval.[35] Bayley, under pressure to act fast due to the volatility in the market, promptly sent the Instructions to UBS.[36]

Sherwood then needed to make the required substantial Settlement Amounts: $957,637.80 to settle the Dynamic Basket roll, and $279,120 to settle the Rentech roll.[37] For the first time in the parties' business relationship, the Term Sheet required Sherwood to settle both trades on a T+1 basis—meaning settlement was due the next day on September 18, 2008.[38] RBS typically required settlement payments on T+2 or T+3, two or three days after execution of the trade.[39]

---

[32] Doc. No. 233 Ex. 14.
[33] Benscher Aff. ¶ 32–33, Doc. No. 224-1; Doc. No. 223 Ex. 15. The Settlement Payment was the difference between the "sell" price of the old Certificates and the "buy" price for the new Certificates. *See* September 17, 2008 Draft Instructions, Doc. No. 223 Ex. 16.
[34] Doc. No. 223 Ex. 16.
[35] September 17, 2008 Bloomberg Chat Transcript, Doc. No. 233 Ex. 17.
[36] Bayley Dep. 143-145, Oct. 31, 2013, Doc. No. 208-22; Doc. No. 223 Ex. 18.
[37] Doc. No. 223 Ex. 18.
[38] *Id.*
[39] Freeman Dep. I at 123, Oct. 5, 2013, Doc. No. 208-13.

Benscher overlooked the T+1 settlement term when he approved the two rolls.[40] Benscher also failed to acknowledge that Sherwood did not have sufficient monies in its unpledged UBS account to make the settlement payment the next day.[41] Benscher needed the consent of Pentagon to use monies in their two pledged UBS accounts to fund the rolls.[42] Benscher also needed to modify the Instructions given to UBS to reflect that Sherwood would use its two pledged UBS accounts—not its unpledged account—to settle the trade.[43]

On settlement day, **September 18, 2008**, Benscher contacted UBS and stopped the money transfer.[44] He called Bayley ten separate times; they spoke at least once.[45] During one of those calls, Benscher told Bayley that Sherwood could not pay for the two rolls. As Bayley puts it, he asked directly: "Can you pay for this?" to which Benscher replied: "No".[46] After the phone call, Benscher and Bayley continued to talk. Bayley relayed that an UBS agent had informed RBS that Benscher "cancelled the roll."[47] Benscher maintains Sherwood never actually "cancelled" the roll; Sherwood just could not make the payment from its unpledged UBS account.[48] Throughout the day on September 18, Benscher tried to get RBS to modify the Instructions to UBS, but RBS refused.[49] RBS's position was clear: it would not engage in further discussions with Sherwood regarding any of its positions unless Sherwood paid the required

---

[40] Benscher Aff. ¶ 33, Doc. No. 224-1.
[41] Benscher Aff. ¶ 34, Doc. No. 224-1.
[42] Benscher Aff. ¶ 34, Doc. No. 224-1.
[43] Benscher Aff. ¶ 34, Doc. No. 224-1.
[44] Benscher Aff. ¶ 35, Doc. No. 224-1; Iseppi Dep. 124–25, Nov. 8, 2012, Doc. No. 208-18.
[45] Bayley Dep. 159–63, Doc. No. 208-22. The contents of these calls are the subject of a motion for spoliation sanctions filed by Sherwood. *See generally* Doc. No. 232.
[46] Bayley Dep. 161–62 & 233–34, Doc. No. 208-22.
[47] Doc. No. 223 Ex. 21.
[48] Benscher Aff. ¶ 36, Doc. No. 224-1.
[49] Benscher Aff. ¶¶ 35–37, Doc. No. 224-1. *See* Instant Bloomberg Chat on September 18, 2008, Doc. No. 223 Ex. 21.

settlement amount.[50] Benscher then sent a formal email to RBS pleading his case.[51] RBS did not respond.[52]

RBS agreed to separate the Rentech roll from the Dynamic Basket roll.  And, on **September 19, 2008**, Sherwood paid the $279,120 settlement to RBS.[53]

The parties, however, reached no resolution on the more costly roll of the Dynamic Basket Certificate.  RBS insisted on payment of the $957,637.80 Settlement Amount before it would consider Sherwood's requested roll.[54] RBS notified Sherwood that its account was "suspended until funds have been received for trades that have been agreed."[55] Bayley further explained that if RBS was "going to have to make a claim against UBS for the [Dynamic Basket] role [sic] then the [account] has to be suspended."[56] Remember, UBS was technically RBS's client; thus, as Bayley alluded, any claim for nonpayment presumably would be lodged against UBS and not Sherwood. Benscher spoke with RBS legal representatives that Friday, but could not reach a resolution.  Benscher claims the lawyer never called him back, establishing a "failure to communicate."[57]

On the following Monday, **September 22, 2008**, Benscher continued to contact RBS and kept asking whether the Dynamic Basket Certificates—the ones on which RBS was awaiting the

---

[50] *See* Instant Bloomberg Chat on September 18, 2008, Doc. No. 223 Ex. 21. One Bloomberg message from Bayley to Benscher showed at least some willingness to extend the settlement date to the following day: "If we receive a mail from UBS confirming the rolls will settle tomorrow, I should be able to re-initiate things, yes." *Id.* No such settlement occurred however.
[51] September 18, 2008 Email from Benscher to Bayley, Bayley Dep. Ex. 28, Doc. No. 208-23 at 86.
[52] Benscher Aff. ¶ 37, Doc. No. 224-1.
[53] Doc. No. 223 Ex. 24 at 3; Benscher Aff. ¶ 38, Doc. No. 224-1.
[54] Doc. No. 223 Ex. 24.
[55] Doc. No. 223 Ex. 24 at 2.
[56] Doc. No. 223 Ex. 24 at 2.
[57] Benscher claims Sherwood's legal representative said he would call back but failed to do so, further showing a pattern of noncommunication. One of Sherwood's breach of contract claims is premised on this failure to communicate.

Settlement Amount—already had "knocked out."[58] RBS continued to demand payment.[59] At the end of the day, Bayley informed Benscher he needed to "step away from communications whilst [RBS's] claim is made against UBS, or until the trades are settled."[60] Bencher then hired a London attorney who arranged a conference call with RBS's legal representative, Adrian Mulryan, and a UBS representative on **September 24, 2008**.

Mulryan's statements at this conference call form the basis of Sherwood's fraudulent and negligent misrepresentation claims.[61] Mulryan stated that RBS regarded the situation as a disputed trade, reiterated that RBS would not consider rolling the Dynamic Basket Certificate until Sherwood paid the full Settlement Amount, and said they expected payment no later than September 25, 2008, or RBS would do everything necessary to mitigate their risk.[62] Benscher again sought information on the current value of the new Dynamic Basket Certificates to determine whether they had already terminated. Sherwood claims Mulryan misrepresented that the Certificates had not "knocked out".  The transcript of the parties' conversation does not support this conclusion.[63]

Sherwood finally paid the Settlement Amount of $957,637.80 for the Dynamic Basket Certificate roll on **September 25, 2008**.[64] Euroclear, the clearing agent, apparently had problems processing the payment.[65]  Until the settlement cleared, Bayley told Benscher he still could take no orders from Sherwood.[66]

---

[58] *See* Instant Bloomberg Transcript of September 22, 2008, Doc. No. 223 Ex. 26 at 1.
[59] *Id.* at 1.
[60] *Id.* at 2.
[61] *See* Transcript of Conference Call on September 24, 2008, Doc. No. 223 Ex. 27.
[62] *Id.* at 7.
[63] *See infra* pp. 24 to 29.
[64] Benscher Aff. ¶ 38, Doc. No. 224-1.
[65] Doc. No. 223 Ex. 30 at 2.
[66] *Id.*

The next day, **September 26, 2008**, while RBS still awaited confirmation that the Dynamic Basket roll settled, Bayley distributed an internal email within RBS that, when sent externally, was intended to notify Benscher that Sherwood's relationship with RBS was "being put under review."[67] Bayley was instructed to intentionally ignore Benscher until RBS received confirmation that the Dynamic Basket settlement went through.[68] RBS's attorney however informed Sherwood's lawyer that "trading will be seeking to carry out a review of the relationship following the recent incident."[69]

On **September 29, 2008**, RBS's counsel informed Sherwood's lawyer that the Dynamic Basket Certificates had "knocked out" and were terminated: "Your client failed to settle a trade – that trade has now settled. This is the end of the matter from our perspective. My understanding is that the product your client purchased, and failed to settle, has knocked out – i.e. been terminated."[70]

Unbeknownst to Sherwood, both the Dynamic Basket Certificates and the Rentech Certificates had "knocked out" the week before, on September 18 and September 16, respectively.[71] The Certificates were worthless before Sherwood paid to settle either trade.  RBS put the entire practice of rolling Certificates with Sherwood under review and refused to roll any of Sherwood's other outstanding Certificates as they "knocked out" over the next few weeks. Six more sets of Certificates—separate and apart from Dynamic Basket and Rentech Certificates —terminated between September 16 and September 18.[72] RBS did not notify Sherwood when these Certificates "knocked out" and did not give Sherwood the opportunity to roll these

---

[67] Doc. No. 223 Ex. 31.
[68] Freeman Dep. I at 294–95, Oct. 5, 2013, Doc. No. 208.
[69] Doc. No. 223 Ex. 35.
[70] Doc. No. 223 Ex. 35.
[71] Freeman Dep. I at 231–38, Doc. Nos. 208-13 & 208-14; Freeman Dep. I, Ex. 50, Doc. No. 208-15 at 116.
[72] Doc. No. 223 Ex. 37; Freeman Dep. I at 313–20, Doc. No. 208-14.

Certificates down to a lower stop-loss level. By **October 8, 2008**, all the Certificates Sherwood held with RBS had terminated. According to Sherwood, its Certificates went from having a value, on August 31, 2008, of $6,815,708 to zero.[73]

Sherwood's 13 claims are all based on two broad arguments. First, Sherwood maintains that RBS was obligated to inform Sherwood when its Certificates "knocked out" and that RBS was obligated to allow Sherwood to roll its investments into new Certificates with a lower stop-loss level. Second, Sherwood claims that once the Dynamic Basket Certificates "knocked out", Sherwood no longer had to pay the Settlement Amount associated with the Certificate.

### Sherwood's Implied-in-Fact Contract Claims Fail (Counts I- IV)

Incredibly, given the size and complexities of the trades, no written or oral contract exists between the parties. No customer term sheet or agreement controls.[74] Sherwood was never even a formal client of RBS. UBS was the titular "client."  Sherwood argues, however, that its historical trading relationship with RBS established a pattern of conduct resulting in an implied-in-fact contract. RBS does not specifically dispute the existence of such a contractual relationship,[75] but disputes Sherwood's terms for the implied-in-fact contract.  The Court concludes that, even assuming an implied contract exists, the terms could not support a contractual breach by RBS as a matter of law based on the undisputed material facts.

"The creation of a contract requires that there be mutual assent to a certain and definite proposition."[76] An implied-in-fact contract "is one form of an enforceable contract; it is based on a tacit promise, one that is inferred in whole or in part from the parties' conduct, not solely from

---

[73] *See* Sherwood's August 31, 2008 UBS Account Statement, Doc. No. 223 Ex. 38; Benscher Aff. ¶ 41, Doc. No. 224-1.

[74] The Court previously found that the term sheets for the Certificates were not binding contracts *per se* because they were governed by the statute of frauds and were not signed by either party. Doc. No. 74 at 8. The term sheets however did delineate the features and operation of the Certificates. *See, e.g.*, August 15, 2008 Term Sheet for Rentech Certificates, Doc. No. 208-1 at 43–49.

[75] Freeman Decl. ¶ 19, Doc. No. 208-1.

[76] *ABC Liquors, Inc. v. Centimark Corp.*, 967 So. 2d 1053, 1056 (Fla. 5th DCA 2007).

their words."[77] As opposed to an express contract—an agreement put into writing or reached

orally—"[a] contract implied in fact is not put into promissory words with sufficient clarity, so a

fact finder must examine and interpret the parties' conduct to give definition to their unspoken

agreement."[78] A contract implied-in-fact depends upon the "assent of the parties."[79] "In a

contract implied in fact the assent of the parties is derived from other circumstances, including

their course of dealing or usage of trade or course of performance."[80]   Based on the parties

conduct, can a court infer that the parties made an implied promise to each other?[81]

RBS and Sherwood agree that they made implied promises to one another but that the

agreement was "not put into promissory words with sufficient clarity."[82] They do *not* agree,

however, on the terms or scope of the implied-in-fact contract.

Sherwood, understandably, asks the Court to imply many terms into the parties'

amorphous implied-in-fact contract including these five terms divined from Sherwood's trading

relationship with RBS:

1.  RBS and Sherwood would maintain open lines of communication (by phone, email, and IB) for trading purposes;

2.  Sherwood (through Benscher) would direct all of the trades of the underlying shares held by RBS relative to the Certificates owned by Sherwood;

3.  When a trade required the purchase and/or sale of Certificates by Sherwood, RBS would promptly prepare a written instruction containing the agreed-upon terms of the trade, and RBS would provide a draft of such instruction to Benscher for his review and potential changes before sending the instructions to UBS;

---

[77] *Commerce P'ship 8098 Ltd. P'ship v. Equity Contracting Co.*, 695 So. 2d 383, 385 (Fla. 4th DCA 1997), *as modified on clarification* (June 4, 1997) (citing 17 Am. Jur. Contracts § 3 (1964)).
[78] *Id.*
[79] *Id.*
[80] *McMillan v. Shively*, 23 So. 3d 830, 831 (Fla. 1st DCA 2009) (quoting *Rabon v. Inn of Lake City, Inc.*, 693 So. 2d 1126, 1131 (Fla. 1st DCA 1997)); *accord Commerce P'ship*, 695 S. 2d at 385.
[81] *Gem Broad., Inc. v. Minker*, 763 So. 2d 1149, 1151 (Fla. 4th DCA 2000) (stating that "the enforceability of a contract implied in fact is based on an implied promise").
[82] *Commerce P'ship*, 695 So. 2d at 385.

4.  Settlement of an agreed-upon trade involving the Certificates was due no earlier than on a T+2 or T+3 basis; and

5.  RBS would notify Sherwood if any of its Certificates breached their Stop-Loss Level, and give Sherwood the opportunity to roll the Certificates.[83]

RBS, also understandably, argues for a simpler, more straight-forward implied-in-fact contract premised on a basic "buy and sell" analogy:  RBS had an obligation to supply the Certificates ordered by Sherwood/UBS, and Sherwood had the concomitant obligation to pay RBS the Settlement Amount according to the agreed-upon settlement terms.

Sherwood argues the parties' conduct established a minimum a two-day, T+2, settlement period.  Because Sherwood did not pay RBS the Settlement Amounts for the Dynamic Basket Certificates within two days of the date Sherwood requested the trade, September 19, 2008, RBS argues it was Sherwood, not RBS, who breached any possible implied-in-fact contract, even applying Sherwood's proposed terms.  The facts are undisputed that Sherwood failed to timely "settle up" within a two-day, or even three-day, period on the Dynamic Basket Certificates. "[I]t is a fundamental principle of Florida contract law that a material breach by one party excuses the performance by the other."[84]

Implied-in-fact contracts generally are associated with uncomplicated transactions, not complex transactions like multi-party, international, speculative derivatives stock trading. "Common examples of contracts implied in fact are where a person performs services at another's request, or 'where services are rendered by one person for another without his expressed request, but with his knowledge, and under circumstances' fairly raising the presumption that the parties understood and intended that compensation was to be paid. In these

---

[83] Doc. No. 223 at 31. These implied terms are taken verbatim from Sherwood's opposition to RBS's Motion for Summary Judgment.

[84] *Hamilton v. Suntrust Mortgage Inc.*, No. 13-60749-CIV, 2014 WL 1285859, at *7 (S.D. Fla. Mar. 25, 2014).

circumstances, the law implies the promise to pay a reasonable amount for the services."[85]   For

those who do business without an express agreement, they proceed at their peril, and courts must

craft terms for the implied-in-fact contract that *reasonable* people would have reached if they

had thought to enter into a formal contract.[86]   The plaintiff moreover has a greater burden

because he has chosen forego the formality of a contract and its protections.   "To hold otherwise

would be to encourage loose dealings and place a premium upon carelessness."[87]

In Count I, Sherwood alleges RBS breached a duty to "provide proper instructions."[88]

Sherwood argues that RBS' T+1 settlement date breached their implied-in-fact contract that the

settlement date for rolls would be on T+2 or T+3 settlement terms. Sherwood's argument is a red

herring.

First, Benscher/Sherwood *explicitly approved* the Term Sheet including the T+1

settlement date of September 18, 2008.[89]   "[I]t is hornbook law in Florida that a party cannot

avoid its obligations under a contract merely because he failed to thoroughly read the contract

terms."[90]   Sherwood agreed to a T+1 settlement date.   Sherwood's argument that an *unwritten*,

*unstated* agreement on the settlement dates based on the parties' prior conduct would trump an

*explicit written* term sheet that Sherwood approved is worthy of Lewis Carroll and his Alice.

Second, Sherwood's argument fails because, regardless of whether the settlement date

was T+1, T+2, or T+3, Sherwood did not have the money to make a timely payment.   RBS

agreed to split the two trades and accept the settlement payment for the Rentech Roll on

---

[85] *Gem Broad., Inc. v. Minker*, 763 So. 2d 1149, 1151 (Fla. 4th DCA 2000).
[86] *Wallace Int'l Trucks, Inc. v. Magruda Trucking Co.*, LP, No. 2:05-CV-277-FTM34DNF, 2007 WL 842146, at *9 (M.D. Fla. Mar. 20, 2007) aff'd, 265 F. App'x 816 (11th Cir. 2008).
[87] *Bromer v. Florida Power & Light Co.*, 45 So. 2d 658, 660 (Fla. 1949).
[88] Complaint, Doc. No. 1 at 26–28.
[89] The instructions Bayley emailed to Benscher clearly stated a settlement date of September 18, 2008. Freeman Decl. Ex. H, Doc. No. 208-1. Benscher approved the instructions through an Instant Bloomberg message dated September 17, 2008. *See* Freeman Decl. ¶ 34 & Ex. I, Doc. No. 208-1.
[90] *Webimax, LLC v. Johnson*, 2013 WL 497843, at *4 (M.D. Fla. Jan. 11, 2013).

September 19, 2008—which corresponds to a T+2 settlement date. But Sherwood did not have the money to pay RBS for the Dynamic Basket Roll on a T+1, T+2, *or* T+3 basis.[91] That RBS demanded payment in one day versus three days is irrelevant. Sherwood lacked the monies to make the payment on any of these options and has established no breach by RBS under Count I based upon a failure to "provide proper instructions."

In Count II, Sherwood argues RBS breached a purported "duty to communicate."[92] RBS again argues that, even if it were bound by such a term, Sherwood's initial breach by failing to timely pay the Dynamic Basket Roll settlement excused RBS from performing. Additionally, RBS argues that any damages Sherwood suffered were not caused by RBS's failure to communicate. Sherwood does not address Count II in its response to RBS's motion for summary judgment or demonstrate how RBS's alleged failure to "communicate" led to damages.

The undisputed facts moreover illustrate that communications between the parties were frequent. Benscher and Bayley spoke by phone on the morning of September 18, 2008.[93] After Bayley rightfully expressed concerned about Sherwood's ability to pay, he instructed Benscher to communicate only through Instant Bloomberg chat, presumably to maintain a written record.[94] Bayley and Benscher communicated by IB every day during the episode.[95] True, RBS's position was rigid—it would accept no further trade requests from Sherwood or allow Benscher to direct trading of RBS's hedge positions until Sherwood paid—but this does not mean RBS did not communicate with Benscher. RBS just did not say what Benscher wanted to hear. RBS's position was consistent, regardless of how much it communicated: it would execute no further trades for

---

[91] Sherwood's lack of unpledged funds to settle the Dynamic Basket Roll is apparent in the conference call between Benscher, Sherwood's attorney, and RBS's general counsel, Adrian Mulryan. Transcript of Conference Call on Sept. 24, 2008, Ex. R at 4, Doc. No. 208.

[92] Complaint, Doc. No. 1 at 28–29.

[93] Bayley Dep. 159–63, Oct. 31, 2013, Doc. No. 208-22.

[94] Bayley Dep. 167–68, Doc. No. 208-22; Doc. No. 223 Ex. 21.

[95] Sept. 17 IB Transcript, Doc. No. 223 Ex. 17; Sept. 18 IB Transcript, Doc. No. 233 Ex. 21; Sept. 19 IB Transcript, Doc. No. 233 Ex. 24.

Sherwood unless it paid the settlement. Sherwood has established no breach by RBS under Count II for "failure to communicate."

Count III tries to insert two unique term's into Sherwood's version of an implied-in-contract: (1) RBS could not sell its own hedge positions without Sherwood's approval or Benscher's direction, and (2) RBS had to allow Sherwood to roll its Certificates when they "knocked out" into new Certificates with lower stop-loss levels. Sherwood apparently claims RBS had to hold its own stock and continue to finance Sherwood's speculative trades in perpetuity whether Sherwood paid RBS or not. Sherwood would have RBS continue to roll the Certificates, even when Sherwood owed it almost $1 million and, at the same time, hold onto securities that RBS, not Sherwood, owned just as the entire global market was crashing in value around them.

As to RBS's right to sell its underlying hedge shares, no material factual dispute exists these securities were owned by RBS, and neither Sherwood nor Benscher had any right to dictate RBS's decision to sell or to retain these securities. The stocks were owned by RBS, who could do with them what they wished.

The Certificates financed by RBS and purchased by Sherwood were nothing more than a speculative bet. RBS wanted to protect its own interest and had sufficient capital to hedge its bet by purchasing underlying shares so that, if RBS "lost its bet" with Sherwood, RBS could sell of the underlying shares and, in theory, at least break even.[96] Benscher admitted in his deposition that RBS owned the shares and Sherwood had no legal capacity to force or direct RBS to

---

[96] As discussed earlier, the underlying shares would increase along with the Certificates. If the Certificates, which were pegged to specific stocks, increased in value then that necessarily means the stock increased in value. Therefore, if Sherwood "cashed in" a Certificate, RBS could just sell off the hedge stock to cover what it owed Sherwood.

purchase or to sell the underlying shares.[97] The *written* terms and conditions attached to the Certificates specifically disclaimed any right Sherwood had to direct the underlying hedge positions.[98] Aside from mere historical conduct, Sherwood has not put forth any evidence to show that RBS "agreed" to allow Sherwood to direct the trading of RBS's hedge positions. The evidence distinctly points to the contrary.  No reasonable person would agree to such a term, and none can be implied in any contract between these parties.

Sherwood's second argument in Count III, that RBS was contractually obligated to allow Sherwood to roll its Certificates whenever they "knocked out" in perpetuity, also fails. No reasonable business person, which is the standard,[99] would allow a client to speculate in derivative securities forever and without regard to whether they paid up or not.  The argument truly is preposterous.

Sherwood attempts to skirt this absurdity by arguing that the "contract" wasn't forever; they could have modified it by mutual agreement. This argument is illogical: if the term required modification to shorten its duration *from* perpetuity, then Sherwood necessarily argues that under its version of their contract, RBS had to fund Sherwood's speculation forever.

No reasonable person would agree to fund Sherwood's betting losses indefinitely.  An implied-in-fact contract requires mutual assent, just like an express contract. The key difference is the manner in which assent is ascertained: conduct as opposed to words. None of RBS's

---

[97] Benscher Dep. I at 304–05, Sept. 24, 2012, Doc. No. 208-4.

[98] The terms and conditions stated: "(f) Hedging Activities. Notwithstanding any communication that you may have had with ABN AMRO in respect of the manner in which ABN AMRO may establish, maintain, adjust or unwind its hedge positions with respect to the Certificates, (i) ABN AMRO may in its absolute discretion determine when, how or in what manner it may establish, maintain, or adjust or unwind its hedge positions; (ii) ABN AMRO may, but is not obliged to, hedge the Certificates dynamically by holding a corresponding position in the underlying asset(s) or any other securities, derivatives or otherwise and may hedge the Certificates individually or on a portfolio basis; and (iii) any hedge positions are the proprietary trading positions of ABN AMRO and are not held on your behalf or as your agent." Terms and Conditions to Rentech Certificates Issued August 15, 2008, Freeman Decl. Ex. C, Doc. No. 208-1 at 47 of 87.

[99] *Wallace Int'l Trucks, Inc. v. Magruda Trucking Co.*, LP, No. 2:05-CV-277-FTM34DNF, 2007 WL 842146, at *9 (M.D. Fla. Mar. 20, 2007) *aff'd*, 265 F. App'x 816 (11th Cir. 2008).

conduct shows an assent to be bound by Sherwood's audacious proposed contractual terms. "Because a contract implied-in-fact is a legal contract based on an unspoken agreement, and [Sherwood] presented no evidence from which a reasonable jury could find that an unspoken agreement existed between the parties,"[100] Sherwood has failed to prove by the undisputed material facts any breach by RBS of the implied-in-fact contract between the parties. RBS is entitled to summary judgment on the breach of contract counts, Counts I through III.

In Count IV, Sherwood asserts RBS breached an implied covenant of good faith and fair dealing. Sherwood has failed, however, to show a breach of any kind by RBS. If no breach occurred, RBS acted in good faith and dealt fairly with Sherwood. "A breach of the implied covenant of good faith and fair dealing is not an independent cause of action, but attaches to the performance of a specific contractual obligation."[101] "[A] claim for a breach of the implied covenant of good faith and fair dealing cannot be maintained under Florida law in the absence of a breach of an express term of a contract."[102] Sherwood has failed to show RBS breached any implied contractual obligations and, as such, cannot show the breach of any implied covenant. Sure, the Certificates "knocked out" and Sherwood lost the potential of reaping huge speculative rewards, but this was not caused by RBS but rather by the mercurial ups and downs of the stock market. Because Sherwood did not show that RBS breached any implied covenant of good faith and fair dealing, RBS is entitled to summary judgment on Sherwood's Count IV.[103]

In summary, the material undisputed facts establish that RBS is entitled to summary judgment on Counts I through IV, all asserting breach of an implied-in-fact contract. The parties operated under a simple implied contract requiring RBS to sell promised Certificates to

---

[100] *Ship Constr. & Funding Servs. (U.S.A.), Inc. v. Star Cruises, PLC*, 135 F. App'x 218, 220 (11th Cir. 2005).
[101] *Centurion Air Cargo, Inc. v. United Parcel Service, Co.*, 420 F.3d 1146, 1151 (11th Cir. 2005).
[102] *Id.* at 52 (citations omitted).
[103] *See id.* (affirming district court's grant of summary judgment for defendant on breach of implied covenant of good faith and fair dealing claim where defendant did not breach the express terms of the parties' agreement).

Sherwood, and Sherwood's obligation to pay the requisite Settlement Amount according to the agreed-upon settlement terms.  RBS breached none of these terms.

### The Independent Tort Doctrine Bars Sherwood's Tort Claims

As a blanket argument against all of Sherwood's tort counts, RBS alleges the independent tort doctrine prevents Sherwood from pursuing its six tort claims. The independent tort doctrine is derived from fundamental contract principles and serves to "bar a tort claim where the offending party has committed no breach of duty independent of a breach of its contractual obligations."[104]  Put differently, a party to a contract cannot recast a cause of action that is otherwise a breach-of-contract claim into a tort claim.[105]  RBS argues that, because the conduct underlying Sherwood's contract counts, Counts I through IV, forms the basis for Sherwood's tort counts, the independent tort doctrine bars the claims.

Some legal scholars question the continuing vitality of the independent tort doctrine after the Florida Supreme Court's decision in *Tiara Condominium Association v. Marsh & McLennan Companies*, which limited the economic loss rule, an analogous doctrine, to products liability claims.[106] Others, including the esteemed judges of the Eleventh Circuit Court of Appeals and

---

[104] *Freeman v. Sharpe Res. Corp.*, No. 6:12-CV-1584-ORL-22T, 2013 WL 2151723, at *8 (M.D. Fla. May 16, 2013).
[105] *Kaye v. Ingenio, Filiale De Loto-Quebec, Inc.*, No. 13-61687-CIV, 2014 WL 2215770, at *4 (S.D. Fla. May 29, 2014).
[106] *Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Companies, Inc.*, 110 So. 3d 399 (Fla. 2013).

the Chief Judge of the Middle District of Florida, suggest that the independent tort doctrine survived the holding in *Tiara*.[107]  If so, Sherwood's tort claims are barred.

"A tort denotes an injury inflicted otherwise than by a mere breach of contract."[108]  The Court already found that the parties' relationship indeed was governed by a simple implied-in-fact contract and that RBS did not breach any contractual terms. As such, Sherwood cannot assert its tort claims based on the same alleged contractual breach under the Independent Tort Doctrine. The Court, however, will discuss the individual merits of each tort claim out of an abundance of caution.

### Conversion (Count X)

Sherwood argues that RBS converted the $957,637.80 settlement payment Sherwood paid for the Dynamic Basket Certificate because the underlying stocks were worthless when the payment was made.  To establish a claim for conversion, Sherwood must prove: "(1) an act of dominion wrongfully asserted, (2) over plaintiff's property, (3) that is inconsistent with plaintiff's ownership therein."[109] To establish a claim for conversion, "the plaintiff must show the defendant 'exercised a positive, overt act or acts of dominion or authority over the money or

---

[107] *See, e.g.*, *Lookout Mountain Wild Animal Park, Inc. v. Stearns Zoological Rescue & Rehab Ctr., Inc.*, 553 F. App'x 864, 865 (11th Cir. 2014) ("[W]e are also not persuaded that plaintiff has identified any tortious acts that are sufficiently independent of the alleged breach of contract to render the tort claims viable." (citing Justice Periente's concurrence in Tiara)); *Kaye v. Ingenio, Filiale De Loto-Quebec, Inc.*, No. 13-61687-CIV, 2014 WL 2215770, at *4 (S.D. Fla. May 29, 2014) ("[T]he fact that the economic-loss rule does not apply to cases where the parties are in contractual privity does not mean that parties in contractual privity may recast causes of action that are otherwise breach-of-contract claims as tort claims."); *Freeman v. Sharpe Res. Corp.*, No. 6:12-CV-1584-ORL-22T, 2013 WL 2151723, at *8 (M.D. Fla. May 16, 2013) ("These contract and tort principles have not changed simply because the economic loss rule is once again restricted to products liability actions. Fundamental contractual principles continue to bar a tort claim where the offending party has committed no breach of duty independent of a breach of its contractual obligations.") (Conway, C.J.).
[108] *Shaw v. Fletcher*, 188 So. 135, 136 (Fla. 1939).
[109] *Id.* (citing *Compania de Elaborados de Café v. Cardinal Capital Mgmt., Inc.*, 401 F. Supp. 2d 1270 (S.D. Fla. 2003)). Conversion is "the disseisin of the owner or an interference with legal rights which are incident to ownership, such as a right to possession." *Del Monte Fresh Produce Co. v. Dole Food Co., Inc.*, 136 F. Supp. 2d 1271, 1294 (S.D. Fla. 2001).

property inconsistent with and adverse to the rights of the true owner.'"[110] "[T]he gist of conversion is . . . the disseisin of the owner or in an interference with legal rights which are incident to ownership, such as the right to have possession."[111]

Sherwood voluntarily and properly paid the settlement payment to RBS as required by the parties' implied-in-fact contract. As it turns out, the Certificates had "knocked out" and become worthless between the time the Certificates were issued and when Sherwood paid RBS. When Sherwood made the settlement payment, it paid what was due and lost any ownership interest in the funds. Sherwood voluntarily paid the funds for securities that, as it turns out, were worthless. Sherwood is just unhappy that the securities decreased so rapidly in value, as were millions of other traders worldwide in September 2008. Sherwood lost its bet, but in no scenario did RBS *convert* Sherwood's monies.

Sherwood cannot show RBS wrongfully asserted dominion over Sherwood's property inconsistent with Sherwood's ownership because Sherwood voluntarily paid the agreed settlement amount. RBS is entitled to summary judgment as a matter of law based on the undisputed facts as to Count X.

### Fraudulent and Negligent Misrepresentation (Counts VII and VIII)

Sherwood's fraudulent and negligent misrepresentation claims arise from the conference call between Benscher, an RBS attorney, Adrian Mulryan, and others held on September 24, 2008.[112] Sherwood alleges Mulryan made statements that mislead Sherwood into believing that the Dynamic Basket Certificates had *not* yet "knocked out." Thus, Sherwood argues it was fraudulently misled into paying for securities that had become worthless. (The call occurred days

---

[110] *Sirpal v. Univ. of Miami*, 684 F. Supp. 2d 1349, 1363 (S.D. Fla. 2010).
[111] *Star Fruit Co. v. Eagle Lake Growers*, 160 Fla. 130, 133, 33 So. 2d 858, 860 (1948).
[112] A UBS representative and an attorney for Sherwood, Nigel Rowley, also were present. Transcript of Conference Call on September 24, 2008, Doc. No. 223 Ex. 27 at 1.

*after* Sherwood's settlement payment was due on September 20, 2008, and *after* Sherwood already had breached its implied-in-fact contract with RBS.)

RBS argues (1) Mulryan's statements are not misleading; (2) Sherwood already knew the Dynamic Basket Certificates had "knocked out"; and (3) due to the parties' adversarial relationship by that point, Sherwood could not have justifiably relied on RBS's statements. The Court will address each argument.

Fraudulent misrepresentation and negligent misrepresentation are similar. To establish a *fraudulent* misrepresentation claim, Sherwood must prove: (1) RBS made a false statement concerning a material fact; (2) RBS knew the statement was false; (3) RBS intended to induce Sherwood to act on the false statement; and (4) Sherwood was damaged by relying on the misrepresentation.[113] Justifiable reliance is *not* an element to a fraudulent misrepresentation claim in Florida.[114] To establish its *negligent* misrepresentation claim, Sherwood similarly must prove: (1) RBS made a misrepresentation of material fact it believed was true but was actually false; (2) RBS was negligent in making the statement because it should have known the representation was false; (3) RBS intended Sherwood to rely on the misrepresentation; and (4) Sherwood was injured by its justifiable reliance upon the misrepresentation.[115] So, in contrast to the fraudulent misrepresentation claim, Sherwood must prove it *justifiably* relied on RBS's alleged negligent misrepresentation to prevail.[116]

The key element is whether RBS' lawyer, Mulryan, knowingly or negligently misrepresented a material fact to Benscher during this call. Sherwood already had paid the

---

[113] *Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010).

[114] *Id.* at 105-06. "[I]n an action involving fraudulent misrepresentation, the [plaintiffs] did not need to allege that they had investigated the truth of the misrepresentations because for this claim, 'a recipient may rely on the truth of a representation, even though its falsity could have been ascertained had he made an investigation, unless he knows the representation to be false or its falsity is obvious to him.'" *Id.* (citing *Besett v. Basnett*, 389 So. 2d 995, 998 (Fla. 1980)).

[115] *Romo v. Amedex Ins. Co.*, 930 So. 2d 643, 653 (Fla. 3d DCA 2006).

[116] *Butler*, 44 So. 3d at 105-06.

$279,000 settlement for the Rentech roll on September 19, 2008, but still had not paid the

$957,000 for Dynamic Basket settlement payment. RBS wanted to know if Sherwood intended

to make this payment. The pertinent portion of the transcript follows:

> Mulryan:    The question we would ask is, A, are Sherwood recognizing that these trades exist and, B, what are Sherwood and/or UBS and/or yourselves doing with respect to settling them? Because if they're not recognized trades and they're not valid trades, then we have to close them out as quickly as we can to ensure that our books are not running any further exposure [unclear] or losses there and then take whatever action is necessary to recover any such losses against all parties in the chain.

> Benscher:   Understood. And from Sherwood's perspective, the valid trade was the trade that was signed, which was, I believe, the roll of the RCK [Rentech] which was one of the two trades on the original, on the original instruction. **But the roll of the basket, given that it was not signed, was not a valid trade.** So in that particular instance, you have to, you have to do whatever you were planning to do with the basket.

> Mulryan:    Well, our position is we were acting in reliance of your instruction, that we have done for each and every other similar trade whereby the trade was struck [?] immediately, the hedge was put on and then the instructions followed in the ordinary course via Esther and UBS. That has always been the methodology employed here. **If you are saying that, that your view is that these are not valid trades, then are you saying you do not recognize a div trade was put on?**

> Benscher:   What I'm saying is that the trade that was signed, which was the roll of the RCK, no problem. **The basket trade, without counter-signature, is not valid, is not a valid trade from us. . . . .**

> Mulryan:    . . . . In this instance, we had something that was allowed to run and run. We were expecting the formal instruction from UBS. We were expecting the follow-up from Esther. **From our perspective the trade was put on, there were various emails, communications and calls in respect to sliding that trade. It's on. It's live.** I'm getting the impression now that basically you're saying that, that the parties here do not recognize it as a valid trade and will not be pursing [sic] any form of further instruction or settlement of that trade.[117]

---

[117] Transcript of Conference Call on September 24, 2008, Doc. No. 223 Ex. 27 at 3.

Sherwood proffers that Mulryan's statements that the "trade" was "valid," "open," and "live" constitutes a representation by RBS that the Certificates had not yet terminated. No reading of the transcript of the call in its entirety supports Sherwood's conclusion.  RBS also argues Sherwood misinterprets Mulryan's statements and accurately identifies an inconsistency between Benscher's statements made during the conference call and Sherwood's current arguments.

During the call, Benscher and Mulryan argued back and forth about whether the term sheet for Dynamic Basket roll was or was not "valid" based on whether Benscher had to sign the new term sheet or not.[118]   No reading of the transcript supports a conclusion that anyone, including Benscher, interpreted this discussion as a representation, false or true, by RBS about the current value of the Dynamic Basket Certificates. Benscher stated that the Rentech Certificate roll was valid because it was signed by Sherwood's agent in Zurich, Esther Iseppi,[119] but maintained that the Dynamic Basket Certificate roll was not a valid trade because it was *not* signed.[120] The discussions did not relate to the value of the underlying Certificates but focused instead on whether Sherwood was bound to pay for the Dynamic Basket Certificate roll even though RBS never received signed instructions from UBS.

Benscher's statements near the end of the call show that, even after Mulryan's earlier statements about whether the trade was valid or not, he still sought information on the value of the Dynamic Basket Certificates, stating, "to the extent that you can get Nigel, a status of the underlying position that would be very, very helpful."[121] To which Mulryan responded: "Again,

---

[118] *Id.* at 2.

[119] Ms. Iseppi worked in an administrative and agency capacity for Sherwood in Zurich, Switzerland, in order to transact business with Sherwood's UBS accounts. Iseppi Dep. 28–35, Nov. 8, 2012, Doc. No. 208-18.

[120] Transcript of Conference Call on September 24, 2008, Doc. No. 223 Ex. 27 at 3.

[121] *Id.* at 7.

how we hedge a particular issue or [unclear] is our particular internal issue."[122] Elsewhere in the phone call, Benscher also sought information on the status of the Certificates; Mulryan avoided making a representation one way or the other.[123] RBS never misrepresented intentionally or negligently the value of the underlying securities.

RBS also points to a statement by RBS's attorney, Nigel Rowley, during the call that acknowledges Sherwood's knowledge that the Certificates already had "knocked out." Referencing the issues between the parties concerning the Dynamic Basket trade, Mr. Rowley stated: "By the time it was brought to our attention that there was a problem, this particular trade happened to be well under water."[124] Sherwood offers no explanation for this statement other than to reach the same conclusion that RBS and the Court reaches: Sherwood knew that the underlying stocks had "knocked out" before the call on September 24, 2008. Sherwood was looking for a way out and avoid paying RBS for the deal by arguing that the roll order was invalid.

Sherwood cannot blame RBS for its loss by asserting RBS made a fraudulent or negligent misrepresentation. Mulryan's statements did not pertain to the value of the Dynamic Basket but instead to questions addressing whether the trade was valid and whether Sherwood had to pay RBS. Sherwood/Benscher could not have relied on Mulryan's statements, justifiably or not, because the record evidence undisputedly shows that Benscher continued to seek information on the value of the Certificates and underlying securities at the end of the call, a tacit acknowledgment that he did not rely on Mulryan's previous statements for any valuation

---

[122] *Id.*

[123] Benscher asked, "[I]f you're holding it open, does that mean that the basket is, is where it is, that, in fact, nothing actually has happened since?" Mulryan responded, "I will have to check with my colleagues in trading. I have no idea as to that level. I, I would presume they are trying to manage their risk of debt [unclear] on this position and I can't confirm that. As to whether it can be put back on, is on, I don't know. I will have to check." Transcript of Conference Call on September 24, 2008, Doc. No. 223 Ex. 27 at 6.

[124] Transcript of September 24, 2008 Conference Call, Doc. No. 223 Ex. 27 at 3–4.

information and likely already knew that the securities were "under water," based on his own lawyer's comments.

The transcript of the call speaks for itself and, when RBS's statements are put in context, RBS made no fraudulent or negligent misrepresentation of a material fact. Sherwood could not have reasonably or justifiable relied on RBS's statements. Finding no material factual disputes, the Court will enter summary judgment in favor of RBS on Counts VII and VIII.

### No Fiduciary Relationship Existed between RBS and Sherwood (Counts V and IX)

Sherwood brings two separate claims predicated on a fiduciary relationship between RBS and Sherwood: Count V for breach of fiduciary duty and Count IX for constructive fraud. To succeed on these counts, Sherwood must prove RBS had a fiduciary relationship to it. Sherwood has failed this task.

To prevail on a breach of fiduciary duty claim, a claimant, like Sherwood, must show that (1) a fiduciary duty existed, (2) the fiduciary duty was breached, and (3) the claimant suffered damages proximately caused by the breach.[125] Likewise, "[c]onstructive fraud exists where a duty arising from a confidential or fiduciary relationship has been abused, or where an unconscionable advantage has been taken."[126] Therefore, both Counts V and IX require Sherwood to prove RBS had a fiduciary relationship that was breached causing Sherwood damages.

A fiduciary relationship can be express—i.e., created by contract—or implied.[127] No written, express contract exists. So, Sherwood must establish an *implied* fiduciary relationship.

---

[125] *See Schwab v. Hites*, 896 F. Supp. 2d 1124, 1133 (M.D. Fla. 2012); *Patten v. Winderman*, 965 So. 2d 1222, 1224 (Fla. 4th DCA 2007).
[126] *Linville v. Ginn Real Estate Co., LLC*, 697 F. Supp. 2d 1302, 1309 (M.D. Fla. 2010); *Harbaugh v. Greslin*, No. 03-61674-CIV, 2004 WL 5589736, at *6 (S.D. Fla. Dec. 14, 2004) (stating "constructive fraud exists where a party abuses a confidential or fiduciary relationship").
[127] *Maxwell v. First United Bank*, 782 So. 2d 931, 933 (Fla. 4th DCA 2001).

An implied fiduciary relationship under Florida law is one "implied in law based on the specific facts and circumstances surrounding the parties [sic] relationship and the transaction in which they are involved."[128] A plaintiff must produce "substantial evidence" that the alleged fiduciary recognized, accepted, or undertook the duties of a fiduciary.[129] The indispensable condition of an implied fiduciary relationship is 'some degree of dependency on one side and some degree of undertaking on the other side to advise, counsel, and protect the weaker party.'"[130]

RBS steadfastly maintains that it never accepted the responsibilities of a fiduciary and, as a matter of law, courts cannot force fiduciary responsibilities upon it. This Court agrees.  A fiduciary relationship does not arise because one side of a business relationship depends on the other side. That is the case in virtually *every* business relationship; one side relies on the other to act in an expected way.  Rather, for a fiduciary obligation to arise, the purported fiduciary must accept the more demanding, fiduciary responsibilities requiring it to act in the best interest of the other party, not itself, which is the virtual opposite of the typical business relationship where parties act in their own best interest. That is, for the "facts and circumstances" to create an implied-in-law fiduciary relationship, a required "circumstance" is that "the allegedly superior party must have accepted a duty to guard the interests of the dependent party."[131] They must agree to protect the dependent party, even if their own interests are detrimentally affected.  The

---

[128] *Thunder Marine, Inc. v. Brunswick Corp.*, 277 F. App'x 910, 912-13 (11th Cir. 2008) (citing *Doe v. Evans*, 814 So. 2d 370, 374 (Fla. 2002)).

[129] *Amoco Oil Co. v. Gomez*, 125 F. Supp. 2d 492, 509 (S.D. Fla. 2000).

[130] *Thunder Marine, Inc. v. Brunswick Corp.*, 277 F. App'x 910, 913 (11th Cir. 2008) (quoting *Watkins v. NCNB Nat'l Bank of Fla., N.A.,* 622 So.2d 1063, 1065 (Fla. 3d DCA 1993)).

[131] *Joyce v. Morgan Stanley & Co.*, 538 F.3d 797, 802 (7th Cir. 2008).

fact that a plaintiff "unilaterally placed his trust in [the defendant] to oversee . . . account investments is . . . insufficient to create a fiduciary relationship."[132]

RBS produced more than ample evidence it never undertook fiduciary responsibilities. Richard Freeman, RBS's representative, declared that RBS never gave Sherwood investment advice or guidance; Sherwood and Benscher were experienced and knowledgeable commercial investors, and Sherwood knew more about the companies it invested in than RBS.[133] Additionally, the term sheets for the Certificates *expressly* disclaimed any fiduciary duty.[134] And, although the term sheets were not binding contracts,[135] Benscher's approval of the term sheet and Sherwood's decision to complete the trades financed in part by RBS indicate he and Sherwood knew that RBS never agreed to assume any fiduciary role.

At its heart, the relationship between RBS and Sherwood was simple.  RBS loaned money to Sherwood so Sherwood could purchase securities. "[C]ourts have held that, in the usual creditor-debtor relationship, a fiduciary duty does not arise."[136] RBS provided Sherwood with 75-80% of the funds required to invest in a particular stock.[137] "An arms-length relationship

---

[132] *Lamm v. State St. Bank & Trust Co.*, 889 F. Supp. 2d 1321, 1332 (S.D. Fla. 2012) *aff'd sub nom. Lamm v. State St. Bank & Trust*, 749 F.3d 938 (11th Cir. 2014); *see Jaffe v. Bank of Am., N.A.*, 667 F. Supp. 2d 1299, 1319 (S.D. Fla. 2009) *aff'd*, 395 F. App'x 583 (11th Cir. 2010); *Joyce*, 538 F.3d at 802 ("The fact that one party trusts the other is insufficient. We trust most people with whom we choose to do business. The dominant party must accept the responsibility, accept the trust of the other party before a court can find a fiduciary relationship." (quoting *Pommier v. Peoples Bank Marycrest*, 967 F.2d 1115, 1119 (7th Cir. 1992)).

[133] Freeman Decl. ¶¶ 25–28, Doc. No. 208-1.

[134] *Id.* at ¶ 24. Exhibit C to Freeman's Declaration is an August 18, 2008 email from RBS to Benscher with new term sheets disclaiming any fiduciary relationship. Freeman Decl. Ex. C at 4, Doc. No. 208-1 at p. 46 of 87. Exhibit D to Freeman's Declaration is an August 18, 2008 email in which Benscher responded with "Its [sic] fine." Freeman Decl. Ex. D, Doc. No. 208-1 at p. 51 of 87.

[135] This Court previously ruled that the term sheets fell within the Statute of Frauds and were not signed. Doc. No. 73.

[136] *Taylor Woodrow Homes Florida, Inc. v. 4/46-A Corp.*, 850 So. 2d 536, 541 (Fla. 5th DCA 2003); *accord Lamm v. State St. Bank & Trust Co.*, 889 F. Supp. 2d 1321, 1331 (S.D. Fla. 2012) ("Under Florida law, banks ordinarily do not owe fiduciary duties to their customers.") *aff'd sub nom. Lamm v. State St. Bank & Trust*, 749 F.3d 938 (11th Cir. 2014).

[137] Freeman Decl. ¶¶ 25-28, Doc. No. 208-1.

can support no implied-in-law fiduciary obligations."[138] Sherwood and RBS engaged in an arms-length business relationship with each side seeking to profit from the transactions.

Sherwood produced absolutely no rebuttal evidence to show that RBS assumed any fiduciary duties.[139] RBS has established as a matter of law that no material factual disputes exist that would demonstrate any fiduciary relationship existed between Sherwood and RBS.[140] And, because a fiduciary relationship is an essential element, RBS is entitled to summary judgment on Counts V and IX asserting breach of a fiduciary duty and a constructive trust.

## Professional Negligence (Count VI)

Sherwood's Count VI for professional negligence also fails. Sherwood alleges RBS is liable for professional negligence because it sold its hedge positions in a negligent manner causing Sherwood's certificates to "knock out". An essential element of any professional negligence count is that the allegedly negligent professional held a professional license that required at least a four-year college degree.[141] RBS argues it is entitled to summary judgment because the traders who liquidated its hedge shares were not required to hold four year degrees and do not qualify as "professionals" under a professional negligence claim.

"A claim for professional negligence is similar to a claim for ordinary negligence except that the standard of care is based on 'the standard of care used by similar professionals in the community under similar circumstances.'"[142] A professional negligence claim is "a cause of action that is only applicable to a vocation requiring at least a four-year college degree before

---

[138] *Thunder Marine, Inc. v. Brunswick Corp.*, 277 F. App'x 910, 913 (11th Cir. 2008) (citing *Taylor Woodrow Homes Florida, Inc. v. 4/46-A Corp.*, 850 So. 2d 536, 541 (Fla. 5th DCA 2003)).

[139] Sherwood only produced conclusory statements from its experts that purported to prove Sherwood had become dependent on RBS. Aside from the fact that these statements hold no evidentiary weight, they do not address whether RBS accepted any fiduciary duties.

[140] *See, e.g., Thunder Marine, Inc. v. Brunswick Corp*., 277 F. App'x 910, 912-13 (11th Cir. 2008) (granting summary judgment in favor of defendant on whether fiduciary duty existed); *Amoco Oil Co. v. Gomez*, 125 F. Supp. 2d 492, 509 (S.D. Fla. 2000) (same).

[141] *See Moransais v. Heathman*, 744 So. 2d 973, 976 (Fla. 1999).

[142] *Waterford LLC v. Garlick*, No. 4:07CV171-SPM/WCS, 2009 WL 248093, at *2 (N.D. Fla. Feb. 2, 2009).

licensing is possible."[143] Further, "a vocation is not a profession if a state license is not required at all."[144]

In its motion for summary judgment, RBS argued that no four-year degree is required for its employees who liquidated RBS's hedge shares. RBS introduced record evidence that no legal requirement exists requiring "the employees who directed and carried out the liquidations of its hedged positions have a minimum four-year college degree" and there is no legal requirement that any RBS employees "involved in the Sherwood trading relationship have a minimum four-year college degree."[145] Sherwood failed to produce a shred of evidence showing that RBS's employees were professionals, had to hold any particular license, or that the license required a four-year college degree. Sherwood has failed to support its claim for professional negligence. RBS is entitled to summary judgment on Count VI.

### The Presumption against Extraterritorial Application of Federal Statutes Bars Recovery of Sherwood's Fraudulent Transfer Claims (Counts XII and XIII)

Sherwood seeks to recover the two settlement payments totaling almost $1.3 million it made to RBS for the Rentech Roll ($279,120) and the Dynamic Basket Roll ($957,637.80) (the "Transfers")[146] as fraudulent transfers under §§ 548 and 550 of the Bankruptcy Code.[147] Sherwood argues these transfers were constructively fraudulent because the underlying certificates already had "knocked out" when the payments were made. So Sherwood argues it did not receive reasonably equivalent value, and the Transfers should be avoided.

---

[143] *Century Land Dev., L.P. v. Weits*, No. 07-14377-CIV-MOORE, 2009 WL 252091, at *3 (S.D. Fla. Feb. 2, 2009).
[144] *Garden v. Frier*, 602 So. 2d 1273, 1276 (Fla. 1992). Admittedly, the Florida Supreme Court in *Garden v. Frier* limited its holding to the specific statute of limitations issue before the court, *id.* at 1277, but the Florida Supreme Court in *Morainsais v. Heathman* used their *Garden* definition of "professional" in the context of determining whether an engineer was a professional in relation to a professional negligence claim. *Moransais v. Heathman*, 744 So. 2d 973, 976–77 (Fla. 1999).
[145] Freeman Decl. ¶ 69, Doc. No. 208-1.
[146] Benscher Aff. ¶ 38, Doc. No. 224-1.
[147] Count XII relates to the Rentech Roll for $279,120, and Count XIII relates to the Dynamic Basket Roll for $957,637.80. Complaint, Doc. No. 1 at pp. 40–41.

The Court will focus on RBS' primary argument that the presumption against extraterritorial application of federal statutes bars application of 11 U.S.C. §§ 548 and 550 to the Transfers. [148] "It is a 'longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.'"[149] RBS urges the Court to apply this longstanding principle, termed the presumption against extraterritorial transfers, prohibiting Sherwood's fraudulent transfer claims under § 548 of the Bankruptcy Code[150] because the Transfers occurred entirely outside of the United States. Sherwood responds that the Transfers had substantial ties to the United States and, alternatively, that Congress intended the statute to apply extraterritorially.

The presumption against extraterritorial application of federal statutes "represents a canon of construction, or a presumption about a statute's meaning, rather than a limit upon Congress's power to legislate" and "rests on the perception that Congress ordinarily legislates with respect to domestic, not foreign matters."[151] The presumption is not jurisdictional, but rather dictates whether United States statutes apply to foreign transactions or conduct.[152] The presumption "serves to protect against unintended clashes between our laws and those of other nations which could result in international discord"[153] and "applies regardless of whether there is

---

[148] RBS makes a number of other subsidiary arguments in seeking summary judgment on the two fraudulent transfer counts. The Court need not address each of these arguments given the ruling on the two primary grounds asserted by RBS.

[149] *Morrison v. National Australia Bank, Ltd.*, 561 U.S. 247, 256, 130 S. Ct. 2869, 2877, 177 L. Ed. 2d 535 (2010).

[150] *In re Maxwell Commc'n Corp. plc*, 186 B.R. 807, 818 (S.D.N.Y. 1995) (hereinafter *Maxwell I*) *aff'd sub nom. In re Maxwell Commc'n Corp. plc by Homan*, 93 F.3d 1036 (2d Cir. 1996).

[151] *Id.*

[152] *See Morrison*, 561 U.S. at 253–55. Sherwood misconstrues RBS's argument as one relating to subject matter jurisdiction. Doc. No. 223 at 60 n.17. This misconception is a common mistake, *see Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 177 (2d Cir. 2008) *aff'd*, 561 U.S. 247, 130 S. Ct. 2869, 177 L. Ed. 2d 535 (2010), and was clarified by the Supreme Court. *Morrison*, 561 U.S. at 253–55.

[153] *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 513 B.R. 222, 226 (S.D.N.Y. 2014) *supplemented*, No. 12-MC-115 JSR, 2014 WL 3778155 (S.D.N.Y. July 28, 2014).

a risk of conflict between the American statute and a foreign law."[154] It reflects the "presumption that United States law governs domestically but does not rule the world."[155]

The rule is that courts should not apply federal statutes to transactions that occur outside the United States unless Congress *expressly* says a statute should apply extraterritorially. Courts have crafted a two-part test to apply this rule. First, a court evaluates the facts and circumstances of each case to determine if applying the federal statute would amount to extraterritorial application.[156] If yes, then second, the court determines whether Congress intended for the statute to apply outside of the United States.[157]

On the first prong of the test, Sherwood relies on Benscher's physical presence in the United States to argue it is not seeking any extraterritorial application of § 548. Sherwood's principal, Benscher, undisputedly resided in and directed trades from the United States. Sherwood kept all of its books and records in the United States and operated its orchid growing subsidiary, Sherwood Farms, from the United States. Benscher initiated all of his contacts with RBS from the United States. These facts, Sherwood advances, show that that the "center of

---

[154] *Morrison*, 561 U.S. at 256.
[155] *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1664, 185 L. Ed. 2d 671 (2013) (quoting *Microsoft Corp. v. AT & T Corp.*, 550 U.S. 437, 454, 127 S. Ct. 1746, 167 L. Ed. 2d 737 (2007)).
[156] *Madoff*, 513 B.R. at 226.
[157] *Id.*

gravity" of the parties' relationship had enough contact with the United States to shift application of § 548 outside of the realm of "extraterritorial."[158]

Sherwood however ignores the extraterritorial nexus of the Transfers themselves.  Courts applying the extraterritoriality presumption to fraudulent transfers typically hold that the proper focus is the *transfers* sought to be avoided, not the parties' relationship or locus.[159]  Courts look at "'the focus of congressional concern,' or, in other words, 'the transactions that the statutes seek to regulate.'"[160] So, the critical test in this case is "the regulatory focus of the Bankruptcy Code's avoidance and recovery provisions."[161]

Section 548 of the Bankruptcy Code focuses on the "nature of the transaction in which property is transferred" and not the relationship between the parties or the debtor's physical presence in the United States.[162] If the debtor's presence in the United States alone defeated a finding of extraterritorial application, the issue would never arise in a bankruptcy case filed in this country.[163]  But the issue does arise because it is the transfer *not* the debtor's physical

---

[158] Sherwood relies on the Court's prior rulings on forum and applicable law for support that the presumption against extraterritorial application does not apply. *See* Doc. Nos. 36 & 74. In the first ruling, on forum *non conviens*, the Court examined a standard completely inapposite to present determination. On that issue, in seeking to relocate forum to England, RBS had to prove: (1) an adequate forum is available, (2) the public and private factors weigh heavily in favor of dismissal, and (3) the plaintiff can reinstate his suit in the alternative forum without undue inconvenience or prejudice. Doc. No. 36 at 3. The Court's determination did not delve into the two Transfers themselves, but focused more on the parties' relationship as a whole, stating "the actions giving rise to [Sherwood's] claim have *some connection* to Florida and the United States." *Id.* at 5.

The second ruling found that Florida had the most significant relation to Sherwood's tort claims, based on a variety of factors wholly separate from those considered here. Doc. No. 74 at 10-13. The Court found that "[p]olicy factors weigh in favor of applying Florida law," that Sherwood operated out of Florida and this "nerve center, albeit small was a necessary element to the transactions between the parties." *Id.* at 11. The Court did not address the fraudulent transfers.

[159] *Madoff*, 513 B.R. at 227; *Maxwell I*, 186 B.R. at 816-17.

[160] *Madoff*, 513 B.R. at 226 (citing *Morrison*, 561 U.S. at 266-67).

[161] *Id.* at 227.

[162] *Id.*

[163] *Id.* ("[A] mere connection to a U.S. debtor, be it tangential or remote, is insufficient on its own to make every application of the Bankruptcy Code domestic.").

presence that determines whether a debtor seeks to impose § 548 outside the borders of the United States.[164]

So, the Court here must determine whether the Transfers occurred extraterritorially considering "the location of the transfers as well as the component events of those transactions."[165] The parties agree that the Transfers were made from Sherwood's accounts at UBS in Switzerland to RBS's accounts in England to settle both trades. A transfer of funds occurred from Switzerland to England. Also, Sherwood is a British Virgin Islands corporation, and RBS is a Netherlands entity.[166] These circumstances are similar to those where courts found extraterritorial application of a federal statute was inappropriate.

In *Securities Investor Protection Corp. v. Bernard L. Madoff Investment Securities LLC*,[167] a fraudulent transfer case, the court found that the presumption applied where a foreign transferee made a subsequent transfer to a foreign subsequent transferee. There, however, the *initial* transfer originated from a United States transferor. The court looked solely at the subsequent transfer and found the presumption to apply. In *In re Maxwell Communication Corp. plc*,[168] an English debtor sought to avoid preferential transfers made to English and French banks. The court reasoned that although the transferred funds were proceeds from the sale of the debtor's United States assets, "[w]hile relevant to an extraterritoriality analysis," this was insufficient, in light of the absence of any other domestic connection, "to characterize the transfers as occurring within the borders of the U.S."[169]

---

[164] *Cf. In re Maxwell Commc'n Corp. plc by Homan*, 93 F.3d 1036, 1051 (2d Cir. 1996) (hereinafter *Maxwell II*).
[165] *Madoff*, 513 B.R. at 227 (quoting *Maxwell I*, 186 B.R. at 817).
[166] Doc. No. 36 at 1–2.
[167] 513 B.R. 222, 227 (S.D.N.Y. 2014) *supplemented*, No. 12-MC-115 JSR, 2014 WL 3778155 (S.D.N.Y. July 28, 2014).
[168] *Maxwell I*, 186 B.R. at 817.
[169] *Id.* at 817.

The Supreme Court's recent decision in *Morrison v. National Australia Bank, Ltd.* presents an even more compelling case.[170] An Australian bank there purchased a United States mortgage servicer, who misrepresented and overstated its value. When the Australian bank adjusted its financial reporting to reflect the reduced value, causing its stock price to slip, investors sued the Australian bank for federal securities fraud. There, the actual fraudulent conduct—the mortgage servicer's overstatement of its value—occurred in the United States. But Justice Scalia reasoned that "the focus of the Exchange Act is not upon the place where the deception originated, but upon purchases and sales of securities in the United States."[171] Because the securities trades were not executed in the United States, and the securities were not listed on U.S. exchanges, the Supreme Court held that the presumption against extraterritorial use of a federal statute barred recovery.[172]

The minimal contacts Sherwood points to in the U.S. cannot displace the presumption's application. Yes, Sherwood's principal lived in the United States and directed Sherwood's business with RBS and UBS from his Florida home. But, "even where the claims touch and concern the territory of the United States, they must do so with sufficient force to displace the presumption against extraterritorial application."[173] Benscher's initiation of the Transfers from the United States does not defeat the presumption's application when the actual Transfers occurred abroad: UBS transferred monies from Sherwood's Swiss account to RBS's English account.[174] Perhaps Justice Scalia put it best: "[I]t is a rare case of prohibited extraterritorial application that lacks *all* contact with the territory of the United States. But the presumption

---

[170] *Morrison v. National Australia Bank, Ltd.*, 561 U.S. 247, 130 S. Ct. 2869, 177 L. Ed. 2d 535 (2010).

[171] *Id.* at 266.

[172] *Id.* at 285–86.

[173] *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1669, 185 L. Ed. 2d 671 (2013).

[174] *Maxwell I*, 186 B.R. at 817; *see Gushi Bros. Co. v. Bank of Guam*, 28 F.3d 1535, 1538-39 (9th Cir. 1994) (holding that merely because a letter containing a request that the plaintiff close its bank account at another bank was sent from a United States territory did not preclude application of the presumption against extraterritorial application of the Bank Holding Company Act, 12 U.S.C. §§ 1971-1978).

against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever *some* domestic activity is involved in the case."[175]

The Court also will not disregard the presumption because RBS has bank branches in the United States. The focus is where the precise Transfers occurred and the events surrounding the Transfers: "Corporations are often present in many countries, and it would reach too far to say that mere corporate presence suffices" to displace the presumption against extraterritorial application.[176]

The Transfers here occurred extraterritorially. The recipient was a Netherlands entity. The transferor was a British Virgin Islands entity. All trading and creation of the underlying securities purchased with the Transfers was performed in London, England. The Transfers lack the requisite contact with the United States to warrant application of § 548 of the Bankruptcy Code. That is, unless Congress *intended* § 548 of the Bankruptcy Code to apply extraterritorially, which leads to the second part of the inquiry.

The second prong of the extraterritoriality inquiry requires the Court to determine whether Congress intended § 548 to apply outside the United States. "[A]ny ambiguity in the statute must be resolved in favor of refusing to apply the law to events occurring outside U.S. territory."[177] Although not frequently addressed, courts have come to different conclusions whether §§ 548 and 550 contain the requisite Congressional intent, and a majority of courts conclude the statute lacks the intent to displace the presumption.[178] This Court agrees with the majority of courts that conclude that the necessary intent is lacking.

---

[175] *Morrison*, 561 U.S. at 266.
[176] *Kiobel*, 133 S. Ct. at 1669.
[177] *Maxwell I*, 186 B.R. at 818.
[178] *Compare Madoff*, 513 B.R. at 226–31; *In re Bankr. Estate of Midland Euro Exch. Inc.*, 347 B.R. 708, 717-18 (Bankr. C.D. Cal. 2006); *Maxwell I*, 186 B.R. at 818–21, *with In re French*, 440 F.3d 145, 151–52 (4th Cir. 2006) (holding that § 541(a) imparts extraterritorial intent on § 548).

The text of § 548 contains no express language indicating Congress intended the statute would apply extraterritorially.[179] Sherwood's only colorable argument points to the statutory structure of §§ 548 and 550 in conjunction with other provisions of the Bankruptcy Code as evidence Congress intention that the statutes would apply abroad.[180] Specifically, Sherwood argues that its fraudulent transfer claims are property of the estate under § 541. Section 541(a) classifies different property interests as estate property "wherever located." This, Sherwood urges, provides sufficient indication that Congress intended § 548 and 550 to apply globally and not just in the United States.

The Court finds this argument unpersuasive. Sherwood provides no argument to impute § 541's "wherever located" language onto § 548 or § 550. Sherwood boldly assumes, without discussing, that fraudulent transfer claims are property of the estate before they are avoided or recovered, an issue on which the Circuit Courts of Appeals are divided.[181] Section 541(a)(3) states that "any interest in property that the trustee recovers under [§ 550]" is property of the

---

[179] *See* 11 U.S.C. § 548; *In re Bankr. Estate of Midland Euro Exch. Inc.*, 347 B.R. 708, 717 (Bankr. C.D. Cal. 2006) ("Nothing in the text of § 548 indicates congressional intent to apply it extraterritorially.").

[180] Sherwood also argues that the *absence* of extraterritorial transfers from § 541(b) (listing examples of what is *not* property of the estate) and §§ 546 and 548's safe harbors show that Congress intended §§ 548 and 550 to reach extraterritorial transfers. This argument cuts against the Supreme Court's requirement of an "'affirmative intention of the Congress clearly expressed' to give a statute extraterritorial effect" in order to rebut the presumption. *Morrison v. National Australia Bank, Ltd.*, 561 U.S. 247, 255, 130 S. Ct. 2869, 2877, 177 L. Ed. 2d 535 (2010).

[181] *Compare In re Allen*, 768 F.3d 274 (3d Cir. 2014); *FDIC v. Hirsch (In re Colonial Realty Co.)*, 980 F.2d 125 (2d Cir. 1992); *Rajala v. Gardner*, 709 F.3d 1031 (10th Cir. 2013), *with Am. Nat'l Bank of Austin v. MortgageAmerica Corp. (In re MortgageAmerica Corp.)*, 714 F.2d 1266 (5th Cir. 1983).

estate. The majority of Circuit Courts of Appeals reason this language means a fraudulent transfer does not become property of the estate until it is "recovered."[182]

The Transfers here have not yet been "recovered" under any definition of the term.[183] Ultimately, "fraudulently transferred property becomes property of the estate only after it has been recovered by the Trustee, so §541 cannot supply any extraterritorial authority that the avoidance and recovery provisions lack on their own."[184] The inclusion of the "wherever located" language in § 541 could show that Congress *knew* how to rebut the presumption against extraterritorial application and chose not to in §§ 548 and 550.[185]

As the Supreme Court stated, "[w]hen a statute gives no clear indication of an extraterritorial application, it has none."[186] Section 548 itself contains no clear indication of extraterritorial application, and the Court declines to impart § 541's extraterritorial provision into the largely unrelated §§ 548 and 550, consistent with other courts who have considered the

---

[182] The argument can be summed up as follows:

> In accordance with 11 U.S.C. § 541(a)(1) (1988), the property of a bankruptcy estate includes (with exceptions not presently pertinent) "all legal or equitable interests of the debtor in property as of the commencement of the case;" and pursuant to 11 U.S.C. § 541(a)(3) (1988), the property of a bankruptcy estate also includes "[a]ny interest in property that the trustee recovers" under specified Bankruptcy Code provisions, including 11 U.S.C. § 550 (1988).... "If property that has been fraudulently transferred is included in the § 541(a)(1) definition of property of the estate, then § 541(a)(3) is rendered meaningless with respect to property recovered pursuant to fraudulent transfer actions." Further, "the inclusion of property recovered by the trustee pursuant to his avoidance powers in a separate definitional subparagraph clearly reflects the congressional intent that such property is not to be considered property of the estate until it is recovered."

*In re Colonial Realty Co.*, 980 F.2d 125, 131 (2d Cir.1992) (citation omitted) (quoting *In re Saunders*, 101 B.R. 303, 305 (Bankr.N.D.Fla.1989)).

[183] *See In re Allen*, 768 F.3d 274, 281 (3d Cir. 2014) (discussing the definition of "recovered" in the context of § 541(a)(3), discounting the requirement of actual recovery, but holding that this Court's order granting recovery under § 550 satisfied the recovery requirement).

[184] *Madoff*, 513 B.R. at 229; *Midland Euro Exch. Inc.*, 347 B.R. at 718 (finding that "neither the plain language of the statute nor its reading in conjunction with other parts of the Code establish congressional intent to apply § 548 extraterritorially").

[185] *Madoff*, 513 B.R. at 230; *see Morrison*, 561 U.S. at 264-65 (observing that a separate section of the Exchange Act showed extraterritorial intent and "when a statute provides for some extraterritorial application, the presumption against extraterritoriality operates to limit that provision to its terms").

[186] *Morrison*, 561 U.S. at 255.

issue.[187] Because application of §§ 548 and 550 to the Transfers at issue would be an extraterritorial application of the federal statutes, the Court determines that Sherwood cannot pursue its fraudulent transfer counts against RBS. Summary judgment is granted in favor of RBS on counts XII and XIII.

### Unjust Enrichment (Count XI)

Sherwood's unjust enrichment claim also does not pass muster. Sherwood maintains RBS was unjustly enriched by retaining the Transfers because the Certificates already had "knocked out" when Sherwood paid the settlement amount. RBS disagrees and seeks summary judgment on Sherwood's unjust enrichment count because (1) their relationship was governed by an implied-in-fact contract, and (2) Sherwood received consideration for the Transfers.[188]

To prevail on its unjust enrichment claim, Sherwood must prove: (1) it conferred a benefit on RBS; (2) RBS accepted the benefit; and (3) under the circumstances, it was inequitable for RBS to accept and retain the benefit without paying the value of such benefit.[189] Unjust enrichment further is inapposite when the parties' relationship is governed by a contract: "A party may recover on an unjust-enrichment claim only when no valid express *or implied-in-fact contract* exists."[190] RBS therefore argues that because an implied-in-fact contract governs their relationship, Sherwood can no longer assert its unjust enrichment claim even as an alternative argument.

---

[187] *See, e.g., Madoff*, 513 B.R. at 226-31; *Midland*, 347 B.R. at 717-18; *cf. Maxwell I*, 186 B.R. at 818–21. *But see In re French*, 440 F.3d 145, 151-52 (4th Cir. 2006) (holding that § 541(a) imparts extraterritorial intent on § 548).

[188] RBS also argues that Sherwood's unjust enrichment claim is preempted by § 546(e) of the Bankruptcy Code. The Court need not reach that argument.

[189] *William Ryan Homes Florida, Inc. v. Whitney Nat. Bank*, No. 8:12-CV-1575-T-33TGW, 2012 WL 4328769, at *4 (M.D. Fla. Sept. 20, 2012) (quoting *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1274 (11th Cir. 2009)).

[190] *SIG, Inc. v. AT & T Digital Life, Inc.*, 971 F. Supp. 2d 1178, 1199 (S.D. Fla. 2013) (emphasis added) (citing *Cent. Magnetic Imaging Open MRI of Plantation, Ltd. v. State Farm Mut. Auto. Ins. Co.*, 789 F. Supp. 2d 1311, 1317 (S.D. Fla. 2011)).

Sherwood misses the mark with its conclusory response, that the unjust enrichment claim is not included its breach of contract claim.[191] The Court, *supra*, found that the parties' relationship was governed by an implied contract: Sherwood purchased Certificates, RBS issued the Certificates, and Sherwood was obligated to pay the settlement for the Certificates according to terms Sherwood approved.[192] Sherwood's unjust enrichment claim overlaps completely with the contract claims.

Sherwood argues the Transfers unjustly enriched RBS because Sherwood was *not* obligated to pay the Settlement Amounts because the Certificates already had "knocked out." That argument flies in the face of the implied contract, which requires Sherwood to pay the agreed-upon settlement amount regardless of whether the Certificates "knock out" quickly or not. Here, Sherwood failed to do so. The substance of Sherwood's unjust enrichment claim should be, and has been, dealt with in the context of their implied-in-fact contract claims, discussed above.

RBS also argues that because Sherwood received consideration for the Transfers—the Certificates—it cannot prevail on an unjust enrichment claim. "When a defendant has given adequate consideration to someone for the benefit conferred, a claim of unjust enrichment fails."[193] When a defendant gives consideration, the last element of an unjust enrichment claim is not satisfied: it is not inequitable for the defendant to accept and retain the benefit without paying the value of such benefit. Further, "[i]t is axiomatic that a party cannot be enriched at the expense of another for receipt of that to which the party is legally entitled."[194]

---

[191] Doc. No. 223 at 60.

[192] *See supra* pp. 14–22.

[193] *Am. Safety Ins. Serv., Inc. v. Griggs*, 959 So. 2d 322, 331–32 (Fla. 5th DCA 2007); *accord Baptista v. JPMorgan Chase Bank, N.A.*, 640 F.3d 1194, 1198 n.3 (11th Cir. 2011).

[194] *In re US Capital Holdings, LLC*, No. 12-14517-JKO, 2013 WL 5297352, at *5 (Bankr. S.D. Fla. Aug. 5, 2013) (quoting *Alaska Sales & Serv., Inc. v. Millet*, 735 P.2d 743, 747 (Ala. 1987)).

On September 17, 2008, Sherwood approved the settlement terms for the Rentech Roll and the Dynamic Basket Roll and agreed to pay the Settlement Amounts for Certificates with well-defined stop-loss levels and Financing Levels. Sherwood had been trading in this speculative fashion with RBS for nearly two years. Moreover, Sherwood's attorney's statements at the September 24, 2008 conference call imply that Sherwood *knew* the Certificates had "knocked out" *before* it tendered the Dynamic Basket Roll settlement payment.[195] Simply put, Sherwood knew or should have known the risks associated with the Certificates. Sherwood received exactly what it bargained for—risky Certificates. Its gamble just did not pay off. RBS was "legally entitled" to the Transfers and was not unjustly enriched. Summary judgment is entered in favor of RBS and against Sherwood as to Count XI.

In summary, the Court is granting summary judgment in favor of RBS on *all* counts. But, because the additional issues concerning the methodology Sherwood used to assert its speculative damages buttress this ruling, the Court, for completeness, also will address the parties' arguments on Sherwood's claimed damages.

### Sherwood's Experts Used the Wrong Standard to Measure Damages

Both RBS and Sherwood agree that if a company fails due to an alleged tort or contractual breach, the company's damages are limited to the market value of the business at the time of the loss. They also agree that lost profits are recoverable if and only if the business was *not* completely destroyed. RBS argues that Sherwood's business stopped operations; Sherwood argues the business continued, albeit in a diminished capacity, and, accordingly, hired experts to opine *only* on lost profit damages. Sherwood did not try to value its business. The issue then is whether RBS has established at this summary judgment stage that Sherwood's business was

---

[195] Mr. Rowley stated: "By the time it was brought to our attention that there was a problem, this particular trade happened to be well under water." Freeman Decl. Ex. R at 3–4, Doc. No. 208-1.

completely destroyed limiting Sherwood to a business valuation measure for damages it cannot now meet.

"In Florida, '[i]f a business is completely destroyed, the proper total measure of damages is the market value of the business on the date of the loss,' not lost profits."[196] But where a business is *not* completely destroyed, it may recover lost profits.[197] So, "[o]nly continuing businesses are entitled to recover lost profits attributable to a defendant's acts."[198] What's more, the types of damages are mutually exclusive: "a business may not recover both lost profits and the market value of the business."[199]

Sherwood, as the plaintiff, must prove entitlement to lost profits.[200] Sherwood has elected to hire experts to opine *only* on lost profits that are recoverable only if the business was on-going after RBS' alleged bad acts occurred. Florida appellate courts have reversed and remanded trial courts for using the wrong method of damages or reduced jury awards attributable to the wrong method of damages.[201] Other courts have disregarded expert testimony if they based their damages calculations on the wrong method of damages.[202]

So, again, the question is whether Sherwood "completely destroyed," which is a mixed question of law and fact. Determining the proper *method* of calculating damages is a question of

---

[196] *City of Key West v. Duck Tours Seafari, Inc.*, 972 So. 2d 901, 903 (Fla. 3d DCA 2007) (quoting *Sostchin v. Doll Enters., Inc.*, 847 So. 2d 1123, 1128 n.6 (Fla. 3d DCA 2003), *review denied*, 860 So. 2d 977 (Fla. 2003)) (other citations omitted); *accord Aetna Life & Cas. Co. v. Little*, 384 So. 2d 213, 216 (Fla. 4th DCA 1980) (reducing jury's award of damages by amount jury attributed to lost profits) ("Lost profits and loss of use may be a proper item of damages if the property or business is not completely destroyed. . . . However, where the property or business is totally destroyed . . . the proper total measure of damages [is] the market value on the date of loss.").

[197] *Montage Group, Ltd. V. Athle-Tech Computer Systems, Inc.*, 889 So. 2d 180, 193 (Fla. 2d DCA 2004) (citing *Aetna*, 384 So. 2d at 216).

[198] *Duck Tours*, 972 So. 2d at 903 (citing *Sosctchin*, 847 So. 2d at 1128 n.6).

[199] *Id.* (citing *Sostchin*, 847 So. 2d at 1128 n.6).

[200] *Montage Group*, 889 So. 2d at 195.

[201] *See Duck Tours*, 972 So. 2d at 903 (holding that the trial court erred in allowing the plaintiff "to seek lost profits as a measure of its damages" and remanded the case for a new trial on damages); *Aetna Life & Cas. Co. v. Little*, 384 So. 2d 213, 216 (Fla. 4th DCA 1980) (reducing jury's award of damages by amount jury attributed to lost profits).

[202] *See Envtl. Biotech, Inc. v. Sibbitt Enterprises, Inc.*, No. 203-CV-124-FTM-33SPC, 2008 WL 5070251, at *6 (M.D. Fla. Nov. 24, 2008).

law. Determining whether Sherwood was "completely destroyed" is a factual question. Despite Sherwood's protestations to the contrary, the record evidence is both robust and convincing that Sherwood was completely out of business by October 2008. Lost profit damages are not allowed.

None of the cases RBS cites set forth a specific test or standard for determining when a business becomes completely destroyed, although they provide useful comparisons. In *Susan Fixel, Inc. V. Rosenthal & Rosenthal, Inc.*, the defendant supplier terminated its agreement with the plaintiff in July 1, 1999, giving rise to the plaintiff's claims.[203] The plaintiff ceased operations "several months later," and the court determined the business was completely destroyed.[204] In *City of Key West v. Duck Tours Seafari, Inc.*, the plaintiff, a boat tour business, ceased operations and "[t]hereafter . . . sold its vehicles and used proceeds to pay off its credit lines and to fund the underlying litigation."[205] The court deemed the business completely destroyed and reversed the trial court's award of lost profits.[206] In *Montage Group, Ltd. v. Athle-Tech Computer Systems, Inc.*, the court deemed the business completely destroyed when it was rendered unable to enter into a new product market due to the defendant's breach of contract and non-delivery of essential software.[207] Because the plaintiff could not enter into the new market, and its old products were obsolete, the plaintiff was left with "no market alternatives."[208] Even though the plaintiff continued to receive *de minimis* revenue from supporting old contracts, the court deemed the business completely destroyed and limited it to business valuation damages.[209]

---

[203] *Susan Fixel, Inc. V. Rosenthal & Rosenthal, Inc.*, 921 So. 2d 43 (Fla. 3d DCA 2006).

[204] *Id.* at 45.

[205] *Duck Tours*, 972 So. 2d at 903.

[206] *Id.*

[207] *Montage Group*, 889 So. 2d 180. The plaintiff's business was creating sports film editing platforms for sports teams. *Id.* at 184. In the 90's, the market began switching from the old analog platforms to new, digital platforms. *Id.* The plaintiff contracted with Montage, one of the defendants, to create a digital software and share profits. *Id.* at 184–86.

[208] *Id.* at 193.

[209] *Id.* at 193 n.11. Importantly, the court noted that the plaintiff's business was "destroyed by 1997" despite earning revenues of $161,787 in 1998; $2,000 in 1999; and $6,500 in 2000. *Id.*

RBS put forth sufficient proof to meet its summary judgment burden to show Sherwood was completely destroyed by October 2008, when RBS ended its relations with Sherwood. The last of Sherwood's Certificates purchased through RBS "knocked out" on October 8, 2008.[210] Sherwood never made another trade or purchase. Sherwood's bank account activity with UBS stopped almost entirely in October 2008.[211] Sherwood's only unpledged bank account with UBS carried a negative or zero closing balance after October 31, 2008.[212] And, because Sherwood was in an "overdrawn credit position," UBS quickly liquidated Sherwood's only remaining positions—a handful of forward contracts with RTK and DDIC.[213] Sherwood stopped using its UBS bank accounts for new or continuing business after October 2008.[214]

Sherwood's own experts testified at deposition that Sherwood had no business activity after October 2008. By Mr. Sussman's own statements, Thornapple was hired "to evaluate whether the activities during September and October 2008 did, in fact, cause Sherwood to not be able to continue in business."[215] Mr. Sussman concluded that RBS's activities caused Sherwood not to continue in business.[216] Another member of the Thornapple team, Mr. Conner, also stated that RBS' actions effectively forced Sherwood out of business.[217] Conner was not aware that

---

[210] Doc. No. 223 at ¶ 42; Doc. No. 223 Ex. 37.

[211] Sherwood had three accounts at UBS. Two were pledged to Pentagon under its financing agreement ("Pledged 2" and "Pledged 3"). "Pledged 3" closed on October 20, 2008. Perrow Decl., Composite Ex. F, Doc. No. 208-44 at p. 18 of 111. Although Pledged 2 had a closing balance of around $1.5 million at the end of October 2008, the account had no activity in November 2008 and, after an "amortization charge" of $1.5 million on December 8, 2008, the account closed at $15,102.36, dwindling to $1,000 by the end of January 2009. Pledged 2 officially closed in June 2009. Perrow Decl., Composite Ex. G, Doc. No. 208-44 at pp. 19–28 of 111. Sherwood's only non-pledged account shows a negative balance beginning on October 13, 2008; the non-pledged account never regained a positive balance before it also was closed in June 2009. Perrow Decl., Composite Ex. H, Doc. No. 208-44 at p. 29–37 of 111. Sherwood never conducted another transaction from the three UBS accounts after October 8, 2008.

[212] Perrow Decl., Composite Ex. H, Doc. No. 208-44 at pp. 29–37 of 111.

[213] Benscher Aff. ¶ 44, Doc. No. 224.

[214] See supra note 211 and materials cited therein. See also Montage Group, 889 So. 2d at 193 n.11 (determining plaintiff's business completely destroyed in 1997 even though it earned $162,000 in 1998).

[215] Sussman Dep. 317, Doc. No. 208-37.

[216] Id.

[217] Conner Dep. 128, Doc. No. 208-39.

Sherwood engaged in any business of any kind after October 2008.[218] One logically would assume an expert analyzing a business' damages would be most familiar with the business' actual operations during that period.

Sherwood makes three points to rebut the conclusion it was out of business by October 2008. First, Sherwood argues RBS failed to pinpoint an exact date the business was completely destroyed. Second, Sherwood argues, after September 2008, it continued business by doing such things as asking UBS for a loan and operating its subsidiary, an orchid farm. Third, Sherwood argues that, because it hopes to continue operations after it wins this litigation and emerges from Chapter 11, Sherwood is a continuing business.

As to the first rebuttal argument, Sherwood relies mainly on one case, *Katz Deli of Aventura, Inc. v. Waterways Plaza, LLC*, to show RBS failed to pinpoint an exact date Sherwood was completely destroyed.[219] In *Katz Deli*, the plaintiff operated under a commercial lease with the defendant.[220] A leaky roof caused incremental but continuing damage to the deli over a year-long period, leading the plaintiff to file a constructive eviction action. The court held that the business was *not* completely destroyed and upheld the trial court's award of lost profit damages because, under the "unique set of facts," the progressively leaky roof slowly caused more harm to the plaintiff's business; the court determined it was impossible to pinpoint when the business was completely destroyed.[221] Because the business was "slowly reduced to nothing" due to the defendant's "long-term, continuing breach," the court upheld the award of lost profits.[222]

This case differs from *Katz*. Sherwood's Certificates became worthless over a short period, about three weeks, ending on October 8, 2008. Sherwood, whose only business was

---

[218] *Id.*
[219] *Katz Deli of Aventura, Inc. v. Waterways Plaza, LLC*, — So. 3d —, 2013 WL 6212040 (Fla. 3d DCA 2013).
[220] *Id.*
[221] *Id.* at *4 ("The leaks began sometime in 2002, but the building did not become untenable until May 2003.").
[222] *Id.* at *4–5.

trading in derivatives, never purchased another derivative again. Sherwood's bank accounts had no meaningful activity after October 2008,[223] and Sherwood has produced no evidence in response to RBS' motion for summary judgment showing any other bank accounts or securities trading to suggest it continued operations after October 2008. Here, it is easy to pinpoint the date of loss: October 8, 2008, when Sherwood's Certificates "knocked out" and RBS refused to fund further trading.

Sherwood also cites *Montage Group, Ltd. V. Athle-Tech Computer Systems, Inc.*,[224] to support the proposition that "'the date of loss' is critical because the market value of the business must be measured on 'the date the business was destroyed.'"[225] Sherwood's reliance on this case is misplaced. Although the court in *Montage* mentions that the "proper measure of [the plaintiff's] damages was the value of its business on the date the business was destroyed," it focuses on an *entire year*—1997—as the destruction date.[226] The *Montage* court ultimately held that the plaintiff's lost profits damages could not support the jury's award, and, even if lost profits *were* the correct measure, the plaintiff's damages evidence was too speculative.[227] A distinct, down-to-the-day date of loss is *not* required for a business to be deemed completely destroyed.[228]

Sherwood next utterly fails to show it continued any meaningful operations after October 2008. Benscher, in early October 2008, apparently met with a UBS representative and asked for

---

[223] *See supra* note 211 and accompanying documents.
[224] *Montage Group, Ltd. V. Athle-Tech Computer Systems, Inc.*, 889 So. 2d 180 (Fla. 2d DCA 2004).
[225] Doc. No. 223 at 42.
[226] *Montage*, 889 So. 2d at 193–94.
[227] *Id.* at 193–96.
[228] *See id.*; *Duck Tours*, 972 So. 2d at 903 (reversing jury's award of lost profits and holding that the plaintiff ceased operations in "June 1996" and [t]hereafter . . . sold its vehicles and used the proceeds to pay off its credit lines and to fund the underlying litigation); *cf. Susan Fixel, Inc. v. Rosenthal & Rosenthal, Inc.*, 921 So. 2d 43, 46–47 (Fla. 3d DCA) (holding that the trial court was correct in determining the plaintiff's expert used the wrong date of loss in calculating damages when the correct date of loss was "late 2009").

a loan to purchase DDIC, a company Sherwood held forward contracts on at UBS.[229] UBS said "no." This failed attempt to raise money does not evidence a continuation of Sherwood's business; rather, it is better evidence that the business already was destroyed.

Sherwood's further contention, it continued in business by operating Sherwood Farms, is vague and conclusory. In his affidavit, Benscher stated Sherwood's role with Sherwood Farms was to "provide financial assistance to Sherwood Farms" "to the extent that it could" and to serve as a guarantee on Sherwood Farms's loan.[230] Benscher claimed that Sherwood "*historically* supplied Sherwood Farms with necessary operating capital, sourced and funded some of the orchid inventory, and also provided a guaranty of the Sherwood Farms' loan with Centennial Bank."[231] Benscher's statements about what Sherwood *historically* did in no way show that Sherwood continued to provide such assistance; to the contrary, Benscher stated that any assistance ended "during 2009."[232] More to the point, Sherwood's "business" was not operating an orchid farm. Sherwood's business was to speculate on securities. It merely possessed an ownership interest in a separate entity which grew orchids, a very different business.

Sherwood lastly says it hopes and intends to resume operations in the future. What hopes or plans Benscher may have for Sherwood after this litigation ends and this Chapter 11 concludes does not affect whether its business was completely destroyed in October 2008. A mere possibility that a business *could* continue sometime in the future does not render it a continuing business. Surely many destroyed businesses pursuing lawsuits hope to restart operations if their litigation efforts prove successful.

---

[229] Benscher Aff. ¶ 42, Doc. No. 224.
[230] Benscher Aff. ¶ 43, Doc. No. 224.
[231] *Id.*
[232] *Id.* Sherwood did not provide any evidence, such as loan payment records, checks, etc. to show that Sherwood provided the orchid farm with any monetary assistance after October 2008. Benscher's conclusory and vague statements are insufficient. Further, Sherwood's UBS account records do not show that any such payments were made during this time period. (*See supra* note 211 and referenced documents.)

Sherwood's business was completely destroyed by October 2008. Sherwood's expert reports opining on Sherwood's lost profits because of RBS's alleged actions are inapposite, used the wrong method for calculating damages, and will be excluded by separate order.[233] Neither of Sherwood's experts sought to determine Sherwood's market value, the only damages Sherwood potentially could recover. They limited their opinions to estimating Sherwood's future lost profits based on speculative assumptions provided by Benscher, which leads to RBS' next argument: even if Sherwood's business continued and lost profits would be the appropriate measure of damages, Sherwood's proof of lost profits is flawed and inadmissible.

### Sherwood Lost Profit Damages are Speculative and Inadmissible

Even if lost profits were the appropriate measure of damages, RBS maintains that Sherwood's damage calculation is speculative and lacks the "reasonable certainty" required by Florida law. Sherwood's experts extrapolated lost profits from Benscher's statements about how he *would have* traded over the five years following September 2008. Sherwood argues that it only needs to show the *existence* of damages not a precise amount of its damages at this summary judgment stage and that its experts properly relied on Benscher's past "event-driven" trading practices support their assumptions. The Court rejects Sherwood's arguments.

To recover lost profits in Florida, a plaintiff must prove "1) the defendant's action caused the damage, and 2) there is some standard by which the amount of damages may be adequately determined."[234] And, "[u]nder the certainty rule, *which applies in both contract and tort actions*, recovery is denied where the fact of damages and the extent of damages cannot be established

---

[233] The Court contemporaneously will enter separate orders on RBS's *Daubert* motions (Doc. Nos. 210 & 211) consistent with this Order.

[234] *W.W. Gay Mech. Contractor, Inc. v. Wharfside Two, Ltd.*, 545 So. 2d 1348, 1351 (Fla. 1989).

within a reasonable degree of certainty."[235] The "reasonable certainty" requirement is a "threshold necessary to be considered legally probative of the amount or extent of damages" suffered by a plaintiff.[236] If a damage calculation is based on speculation or conjecture, as opposed to reasonable certainty, then summary judgment for the defendant is appropriate.[237]

Sherwood correctly argues that it need not prove the precise amount of damages at this summary judgment junction, but Sherwood misses the mark by relying on cases for the proposition that "a plaintiff's proof of damages will be sufficient as long as he provides some evidence by reference to which the amount of damages may be satisfactorily ascertained."[238] RBS is not trying to lock Sherwood into a specific dollar amount for its damages. RBS instead argues that Sherwood has failed to show the *causation* of damages with any reasonable certainty.

Assuming RBS engaged in the alleged bad acts, Sherwood still has failed to show how RBS' actions caused the lost profits sought by Sherwood. An essential link, the causation prong, is missing. The Eleventh Circuit in *Messer v. E.F. Hutton & Co.* rejected a nearly identical argument made by the plaintiff (Messer) in that case.[239] Messer argued that the defendant's actions prevented him from reaping gains that would have been realized by following his stock

---

[235] *Nebula Glass Int'l, Inc. v. Reichhold, Inc.*, 454 F.3d 1203, 1212 (11th Cir. 2006) (emphasis in original).

[236] *Saewitz v. Saewitz*, 79 So. 3d 831, 833 (Fla. 3d DCA 2012).

[237] *Lipscher v. LRP Publications, Inc.*, 266 F. 3d 1305, 1317-18 (11th Cir. 2001) (affirming district court's grant of summary judgment when proof of lost profits damages was not supported by evidence other than principal's affidavit); *Resolution Trust Corp. v. Stroock & Stroock & Lavan*, 853 F. Supp. 1422, 1429 (S.D. Fla. 1994) ("As a general matter, this Court is properly reluctant to grant summary judgment on the basis of issues involving causation and damages. However, having thoroughly explored what would have been presented to the jury, the Court cannot help but conclude that the degree to which the RTC's damage theories rest on speculation raises the dispositive issues to the level of being questions of law. It is also quite clear that in such situations, the issues need not, and should not, go to the jury."); *cf. Brough v. Imperial Sterling Ltd.*, 297 F.3d 1172 (11th Cir. 2002) (reversing jury award and holding that judgment as a matter of law should have been granted in favor of the defendant because proof of lost profits must be, and was not, "proven with a reasonable degree of certainty before [lost profits] are recoverable. The mind of a prudent impartial person should be satisfied that the damages are not the result of speculation or conjecture").

[238] *Britt Green Trucking, Inc. v. FedEx Nat., LTL, Inc.*, No. 8:09-CV-445-T-33TBM, 2014 WL 3417569, at *7 (M.D. Fla. July 14, 2014); *accord Slip-N-Slide Records, Inc. v. TVT Records, LLC*, No. 05-21113-CIV, 2007 WL 3232274, at *12 (S.D. Fla. Oct. 31, 2007) ("Proof of the amount of damages need not conform to any particular methodology, and exact proof of the amount of damages is not required.").

[239] *Messer v. E.F. Hutton & Co.*, 833 F.2d 909 (11th Cir. 1987), *amended on reh'g in part*, 847 F.2d 673 (11th Cir. 1988) (damages decision was not disturbed on rehearing).

broker's documented investment advice.[240] The Eleventh Circuit upheld the trial court's ruling

that lost profits damages were too speculative because Messer had no history of following his

broker's investment plan, and in doing so, rejected the exact argument Sherwood advances:

> Messer argues that his proof of damages is not speculative because
> damages need not be measured with "absolute exactness." The
> problem with Messer's proof of damages, however, is not the
> *measurement* of damages but their *causation.* Unless a plaintiff can
> show with reasonable certainty that the defendant's wrongful
> conduct proximately *caused* damages, questions of measurement
> never arise. Since Messer cannot show with reasonable certainty
> that he would have followed E.F. Hutton's investment plan, he
> cannot prove that the April 29 unauthorized trade proximately
> resulted in lost future profits.[241]

RBS argues, similar to the arguments in *Messer*, Sherwood's experts cannot rely on

Benscher's "investment strategy" to estimate lost profit damages with any reasonable certainty.

In *Messer*, the plaintiff's broker *had* a written investment plan, but the court found the plaintiff

had no history of following it. Sherwood, in contrast, has never had a written investment plan.

Sherwood just bought and sold securities based on Benscher's preferences and research all

financed by RBS and Pentagon.  He had no master plan or investment strategy.  "This is not a

case where substantial damages have been proved, and it is just a matter of figuring out the

precise amount."[242]  The issue is proximate cause: Sherwood must establish a "reasonably

certain" causal link between RBS's alleged conduct and the damages it seeks. Sherwood "cannot

seek refuge in the line of case holding that inability to show the precise damage amount does not

preclude recovery."[243]

Because Sherwood had no investment plan, Sherwood's experts based their lost profits

estimations *solely* on Benscher's statements about how Sherwood, i.e., Benscher, would have

---

[240] *Id.*
[241] *Id.* at 923.
[242] *Resolution Trust Corp. v. Stroock & Stroock & Lavan*, 853 F. Supp. 1422, 1429 (S.D. Fla. 1994).
[243] *Id.*

invested for five years after October 2008. Sherwood proffers two expert reports to support its estimation of damages: the Thornapple Report and the Foerster Report.[244]

The Thornapple Report contains four damages calculations.[245] Each damage calculation is based on differing but often overlapping assumptions.[246] In its two more conservative estimates, Thornapple assumed Sherwood maintained its exposure in positions held with RBS in September 2008, "until an event occurred."[247] "When an event occurred, such as an acquisition or a special dividend, or when it was clear that an event would not occur, we adopted as an assumption of fact, based on input from Benscher, that the position would be liquidated and that the proceeds would be reinvested."[248] The first, "most conservative" estimate totaled about $12 million in damages.[249] The second estimate, similar to the first but assuming Sherwood leveraged its trades, estimated nearly $18 million in damages.[250] The latter two more aggressive damage estimations ramped the assumptions up a step further and were based on "how [Benscher] would have most likely dynamically traded the portfolio over the period from September 17, 2008 through December 31, 2013."[251] Under the "active trading" assumptions, Thornapple estimated $113 million in damages without leverage and $209 million with leverage.[252] The experts behind the Thornapple Report also may have relied on other assumptions not expressly list in its report.[253]

---

[244] The expert reports can be found attached to RBS's respective motions to exclude the reports. *See generally* Thornapple Report, Doc. No. 210 Ex. A; Foerster Report, Doc. No. 211 Ex. A.
[245] Thornapple Report 44–46, Doc. No. 210 Ex. A.
[246] Thornapple Report Exs. C–F, Doc. No. 210 Ex. A.
[247] Thornapple Report 44, Doc. No. 210 Ex. A.
[248] *Id.* at 44–45. Thornapple used the Russel 2000 Index, which is pegged to US small-cap stocks, as a proxy for the type of small-cap business Benscher said he liked to buy.
[249] Thornapple Report 45, Doc. No. 210 Ex. A.
[250] *Id.*
[251] *Id.* at 45–46.
[252] *Id.*
[253] Sussman Dep. 240–41, June 4, 2014, Doc. No. 208-37.

The Foerster Report only estimates a single damage figure related to Sherwood's investment in Rentech held with RBS in September 2008.[254] Foerster opines that RBS's actions, which allegedly divested Sherwood of its position in Rentech, resulted in Sherwood's inability to capitalize on an event that caused Rentech stock to skyrocket three years later, in 2011.[255] This opinion assumed Sherwood maintained its 3% exposure to Rentech through late 2011, when Rentech spun off one of its profitable divisions thereby dramatically increasing the company's value.[256] Assuming Sherwood maintained this 3% exposure, Foerster estimated Sherwood stood to profit $20 million from the increase in value.[257]

"[D]amages may not be awarded for lost profits when those profits are dependent on a party taking an action that it is unclear he would have taken."[258] Florida law is reluctant to award damages on speculative assertions by a plaintiff wishing to "recover anticipated profits based only on his claim that he would have sold the securities at the optimal time absent" the defendant's conduct.[259] "While the existence of a programmed investment plan which incorporates a predetermined response to market conditions might enable a court to calculate lost profits with some certainty, it can only do so with some proof that the investor would in fact follow the investment plan."[260] Sherwood must prove with reasonable certainty it had an investment plan and, perhaps more important, that Sherwood would have followed the plan during the five-year period.

Sherwood has failed to meet this test. Its experts relied *solely* on Benscher's self-serving, after-the-fact statements on how Sherwood would have invested. The Thornapple experts based

---

[254] Foerster Report 28, Doc. No. 211, Ex. A.
[255] *Id.* at 28–29.
[256] *Id.* at 29.
[257] *Id.*
[258] *Brough v. Imperial Sterling Ltd.*, 297 F.3d 1172, 1177 (11th Cir. 2002).
[259] *Kane v. Shearson Lehman Hutton, Inc.*, 916 F.2d 643, 647 (11th Cir. 1990).
[260] *Messer v. E.F. Hutton & Co.*, 833 F.2d 909, 922–23 (11th Cir. 1987).

their report solely on the assumptions Benscher formulated and communicated to them verbally and through email.[261] Benscher never provided the Thornapple experts with any written plan, much less one created prior to September 2008, outlining his planned investment strategy for the five-year period.[262] Thornapple's experts moreover did not even analyze Sherwood's historical trading activity.[263]

Sherwood's other expert, Foerster, relied solely on a two to three hour conversation with Benscher in formulating the assumptions on what Sherwood would have done[264] and also used no written investment plan to come to his conclusions.[265] Forster's expert opinions relating on damages were based on his opinion that Benscher "was a gentleman that understood the securities business in a way that few do" and that Benscher's strategy was "taking advantage of opportunities as they arise."[266]

Sherwood had no written plan; it had no coherent investment strategy; and it then lacked a plan to follow for the relevant five-year period.  Benscher may be a securities savant but he never wrote down his strategy, and Sherwood has produced no credible evidence that any plan existed or that Benscher would follow a plan, if it existed.  Sherwood's lost profit damages are speculative and were not reasonably certain to follow from RBS's alleged misconduct.

Assumptions based solely on a plaintiff's testimony are inherently suspect, especially concerning what he would have invested in and when. "Florida law requires that the assumptions used to support [an expert's] conclusions be reasonably certain, not mere best case scenario

---

[261] Sussman Dep. 18, 132–33, Doc. No. 208-37; Conner Dep. 49–54, June 5, 2014, Doc. No. 208-39.
[262] Sussman Dep. 132–35, Doc. No. 208-37.
[263] Conner Dep. 68, Doc. No. 208-39.
[264] Foerster Dep. 171–72, May 28, 2014, Doc. No. 208-33.
[265] *Id.* at 172.
[266] *Id.*

predictions."[267] "A plaintiff's 'self-serving assertion' is 'precisely the type of evidence' that courts hold to be insufficient to establish lost profits."[268] In *Emerald Investments*, Judge Posner of the United States Seventh Circuit Court of Appeals characterized a principal's statements about when he would have made certain trades as "worthless."[269] Judge Posner stated that testifying one would have made a profitable trade "is no evidence one would have traded then, for there is no way in which such testimony could be tested."[270] It would have been different if the plaintiff traded on some specific formula, "[b]ut it did not trade on formula. It traded on hunch."[271]

Perhaps Benscher has unique securities trading skills and Sherwood traded on more than "hunch," but the difference is not enough to be material. Sherwood argues Benscher used an "event driven" and "active investor" approach.[272]   Sherwood would often attempt to create positive change in a business, i.e. change corporate structure or facilitate mergers, then capitalize on a resulting increase in stock price.[273] If Sherwood's strategy was for Benscher to act as the "catalyst to create value,"[274] it produced no evidence that Benscher *did* anything to cause the underlying market events relied upon by Sherwood's experts. Benscher's fantasized capitalization on these "events" amounts to nothing more than hindsight-laden conjecture and speculation.

---

[267] *Sun Ins. Mktg. Network, Inc. v. AIG Life Ins. Co.*, 254 F. Supp. 2d 1239, 1247 (M.D. Fla. 2003). *See Nat'l Papaya Co. v. Domain Indus., Inc.*, 592 F.2d 813 (5th Cir. 1979) (applying Florida law, vacating a lost profit damage award for failure to prove underlying assumptions).
[268] *Alphamed Pharm. Corp. v. Arriva Pharm., Inc.*, 432 F. Supp. 2d 1319, 1348 (S.D. Fla. 2006) *aff'd*, 294 F. App'x 501 (11th Cir. 2008).
[269] *Emerald Investments Ltd. P'ship v. Allmerica Fin. Life Ins. & Annuity Co.*, 516 F.3d 612, 618 (7th Cir. 2008).
[270] *Id.*
[271] *Id.*
[272] Doc. No. 223 at 45–46. *See* Benscher Aff. ¶¶ 20–30, Doc. No. 224-1; Thornapple Report 44, Doc. No. 210 Ex. A.
[273] Thornapple Report 44, Doc. No. 210 Ex. A; *see* Benscher Aff. ¶¶ 20–30, Doc. No. 224-1.
[274] Thornapple Report 44, Doc. No. 210 Ex. A.

Sherwood further argues its experts only based their opinions on "events" relating to positions Sherwood held in September 2008. Like the Eleventh Circuit observed in *Messer*, however, there is no evidence that Sherwood would have followed the assumptions Thornapple relied on, save Benscher's self-serving affidavit, rendered with complete benefit of hindsight.[275] Sherwood claims the assumptions are based on how Benscher invested in the past. Even assuming this is true,[276] "it rests on the assumption that [Sherwood] would continue to act in that manner."[277] Even "where the investment option is known, time-sensitivity of transactions alone can inject enough uncertainty into the measurement of damages to render lost profits unrecoverable."[278] Sherwood "could have decided at any time to change its business strategy" and cease its speculative trading, especially since, under the best-case scenario, the investments did not regain their value until 2010 or later.[279] "Perhaps [Sherwood] would not have invested in the same way."[280] The important point is that "damages may not be awarded for lost profits when those profits are dependent on a party taking an action that it is unclear he would have taken."[281] The investment path Sherwood would have chosen throughout the turbulent recession of 2008 and 2009 is entirely unclear. Sherwood never had a written contract with RBS, and it never had a written investment strategy it followed. Any damage calculation based on Benscher's imagination is speculative and inadmissible.

Sherwood's damage estimates also depend on other implicit assumptions, beyond that offered by Benscher, that make the calculation even more speculative. In Thornapple Report's

---

[275] *See Messer*, 833 F.2d at 922–23.
[276] Sherwood produced no historical trading evidence, nor did Sherwood's experts analyze Sherwood's past trading practices. Conner Dep. 68, June 5, 2014, Doc. No. 208-39.
[277] *Brough*, 297 F.3d at 1178.
[278] *Resolution Trust Corp. v. Stroock & Stroock & Lavan*, 853 F. Supp. 1422, 1426 (S.D. Fla. 1994).
[279] *Id.*; *see Messer*, 833 F. 2d at 923 ("[T]here is little reason to believe that Messer would have stayed with the plan to the point it became profitable. If Messer had followed the plan, he would have suffered extreme intermediate losses over $200,000 in excess of his credit limit . . . .").
[280] *Merit Ins. Co. v. Colao*, 1989 WL 917, at *2 (N.D. Ill. Jan. 3 1989).
[281] *Brough*, 297 F.3d at 1178.

two leveraged damages estimates, Sherwood's experts assumed RBS would have continued to provide 4 to 1 leverage throughout the five year period.[282] The evidence is undisputed that RBS ended its relationship with Sherwood in October 2008. "[W]hen a defendant has the right to terminate the contract or sales of the product in issue, future events are uncertain."[283] Even if RBS's termination of its trading relationship with Sherwood *was* wrongful, surely it was not obligated to fund Sherwood's Certificates for five more years.

Nor was UBS obligated to continue to act as an approved counterparty.[284] UBS terminated its relationship with Sherwood in April 2009, when it ceased doing business with all clients domiciled in the United States.[285] Sherwood argues it could have successfully challenged that letter, but it chose not to.[286] Sherwood had no approved counterparty to work with RBS.

Sherwood's damage estimates also depend on continued financing by Pentagon, something RBS questions.[287] Sherwood highlights emails between itself and Pentagon to show Pentagon's "agreement" to fund Sherwood's trades through the recession and beyond.[288] The emails do not create a contract or establish any agreement; they may indicate Pentagon's intent

---

[282] Sussman Dep. 243–51, June 4, 2014, Doc. No. 208-37. Thornapple also did not seek to determine the availability of a different counterparty willing to extend 4-1 leverage in the same fashion as RBS. *Id.* at 244–45. And the Court finds it incredulous to assume that, as the global market was careening downward into a recession, some hypothetical lender would provide Sherwood 4-1 leverage.

[283] *Envtl. Biotech, Inc. v. Sibbitt Enterprises, Inc.*, No. 203-CV-124-FTM-33SPC, 2008 WL 5070251, at *5 (M.D. Fla. Nov. 24, 2008).

[284] RBS maintains it would not have accepted any counterparty other than UBS. Freeman Decl. ¶¶ 6–7, Doc. No. 208-1.

[285] UBS April 16, 2009 Client Letter, Benscher Dep. II, Ex. 29, Oct. 2, 2013, Doc. No. 208-11 at 6–8.

[286] Sherwood argues the terms of the letter should not have applied to it because it is a British Virgin Islands corporation, not a U.S. domiciled corporation. Benscher Aff. ¶ 2–3, Doc. No. 224-1.

[287] RBS's expert report alleges Sherwood would have required $11 million in funding from Pentagon to roll down its positions through June 1, 2009. NERA Report at 3, Perrow Decl. Ex. I, Doc. No. 208-44. Even if this is not the exact figure, Sherwood certainly would require substantial additional funding to continue to trading until the market hit its low point in 2009.

[288] Doc. No. 223 Ex. 42.

to reduce the terms discussed into a formal contract.[289] No final written agreement between Pentagon and Sherwood however was offered.[290] Pentagon's hesitancy to fund the September 18, 2008, Dynamic Basket roll belies Sherwood's argument that Pentagon would continue to finance Sherwood *ad infinitum*. Whether Sherwood could obtain needed financing from Pentagon adds yet another element of uncertainty on Sherwood's damages estimates.

RBS lastly argues Sherwood's experts omitted any expenses and costs in its profits calculations. If a plaintiff "presents evidence only of gross receipts or fails to prove expenses with some specificity, an award of damages relating to lost profits will be reversed."[291] For one, Sherwood's damages estimations do not consider any operating or overhead expenses, such as Benscher's or Iseppi's wages. Failure to include officer compensation in lost profits damages calculations is "inadequate as a matter of law."[292] The Court agrees with RBS and finds it difficult to fathom that Sherwood would incur no operational expenses over the five-year damages period.

Aside from operational expenses, Sherwood's experts failed to consider the *cost* of rolling down into lower Certificates as the market declined through 2009. When a Certificate

---

[289] The January 14, 2008 email from Chester to Benscher states: "Please confirm that you are in agreement, so that we have something on record while the guys work out the paperwork." Doc. No. 233 Ex. 42. Although "the parties' intent to eventually reduce the agreement to writing does not prevent the contractual obligations from arising immediately . . . the parties must intend that their oral or written negotiations be immediately binding." *Venus Lines Agency, Inc. v. CVG Int'l Am., Inc.*, 234 F.3d 1225, 1230 (11th Cir. 2000). Benscher clearly did not intend these preliminary negotiations to be binding: he did not even manifest acceptance. In response to Chester's email outlining the proposed terms they clearly intended to reduce to a formal contract, Benscher stated: "I'll respond tomorrow because I'm not home but seems ok." Doc. No. 233 Ex. 42. He then went on to modify Chester's stated terms. *Id.*
[290] Chester testified that he could not remember if such an agreement was ever created. Chester Dep. 165, Nov. 1, 2013, Doc. No. 208-26.
[291] *Clayton v. Howard Johnson Franchise Sys., Inc.*, 954 F.2d 645, 652 (11th Cir. 1992); *see Sostchin v. Doll Enterprises, Inc.*, 847 So. 2d 1123, 1125 (Fla. 3d DCA 2003) (reversing damages award because the "lost profits damages award was improperly based upon gross profits, rather than net profits, and was, to say the least, speculative").
[292] *Sostchin*, 847 So. 2d at 1126 ("The accounting alchemy by which this humble enterprise was transformed into an engine of commerce is made possible only by first improperly failing to include officer compensation as part of the corporation's expenses, and thereby basing all assumptions upon gross profits, rather than net profits as the law requires.").

"knocked out," and Sherwood rolled into a Certificate with lower Financing Levels and Stop-Loss levels, it would owe an equity contribution, i.e., settlement amount to RBS. Sherwood's experts did not consider these substantial costs.[293] According to RBS's experts, these costs would have totaled $11 million from September 17, 2008 through June 2009.[294] Sherwood's failure to account for these significant costs is yet another reason its lost profits calculations do not pass muster.

Sherwood's experts relied solely on Benscher's self-serving statement to forecast Sherwood's trading activity over five years. Benscher had no written investment plan. He had no history of following any such plan. The experts moreover assumed RBS would continue to finance highly leveraged trades for five years and that UBS would continue to act as an approved counterparty for five years, neither of which assumptions was reasonable. They also assumed Pentagon would continue to finance trades without question, even though they failed to do so in October 2008. The experts lastly failed to adjust the estimated lost profits to reflect normal costs and expenses. The opinions are speculative.

Leaving a jury decide whether its experts' forecasts are too speculative to show causation, as Sherwood urges, is not a valid option. The trial court is the gatekeeper for expert evidence. The Court's primary concern is that a jury may mistake Sherwood's experts' assumptions as based in fact when they are not. As one court stated:

> [T]he greater danger is that the jury may accept as fact not just the faulty assumptions on which [the expert] relied, but may also accept the conclusions that are drawn through his use of these assumptions. When the assumptions made by an expert are not

---

[293] Sussman Dep. 197–99, June 4, 2014, Doc. No. 208-37; Foerster Dep. 195–97, May 28, 2014, Doc. No. 208-33.
[294] NERA Report at 61–65, Perrow Decl. Ex. I, Doc. No. 208-44.

based on fact, the expert's testimony is likely to mislead a jury, and should be excluded by the district court.[295]

There is no reasonable certainty that Sherwood would have taken the actions Benscher promotes.  Classifying Benscher's investment strategy as "event driven" and "active" provides no concrete basis to extrapolate damages with reasonable certainty. How can this Court, much less a jury, conclude with reasonable certainty that Benscher would have invested the way he claims he would have?  Juries should not have to weed through this type of speculative opinion testimony.  So, even if lost profit were recoverable by Sherwood, its experts have failed to demonstrate with any reasonable certainty any causation between the damage calculation and RBS' action.  For this additional reason, Sherwood's expert opinions are inadmissible, Sherwood has no other evidence of damages, and RBS is entitled to summary judgment on damages and under every count.

## **Conclusion**

Sherwood's business was to trade risky derivatives using other people's money.  RBS funded this gamble for a time, but ended its relationship with Sherwood in September 2008, when the stock market globally collapsed.  Many businesses, including Sherwood, failed.  By October 2008, Sherwood was completely destroyed.  Sherwood raises many arguments that, *if* RBS had not terminated its relationship, then Sherwood surely would have stuck it out through the dog days of the recession and emerged successful on the other side. As Justice Scalia aptly observed: "Life is too short to pursue every human act to its most remote consequences; 'for want of a nail, a kingdom was lost' is a commentary on fate, not the statement of a major cause

---

[295] *Three Crown Ltd. P'ship v. Salomon Bros., Inc.*, 906 F. Supp. 876, 894 (S.D.N.Y. 1995) (*quoting Tyger Const. Co. Inc. v. Pensacola Const. Co.*, 29 F.3d 137, 144 (4th Cir. 1994)).

of action against a blacksmith."[296] Based on the record evidence, the Court cannot fault RBS' actions.

Even if RBS's actions were wrongful, however, Sherwood further cannot prove the cessation of their relationship proximately caused the speculative, lost profit damages it seeks. And for all of the other reasons finding in favor of RBS on liability, the Court will grant summary judgment in favor of RBS and against Sherwood on all counts. A final judgment summary judgment consistent with the Memorandum Opinion shall be entered.

DONE AND ORDERED in Orlando, Florida, on _____. 2015.


_____
United States District Judge


Attorney for Defendant is directed to serve a copy of this Memorandum Opinion on interested parties who are non-CM/ECF users and file a proof of service within 3 days of entry of the order.

---

[296] *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 287, 112 S. Ct. 1311, 117 L. Ed. 2d 532 (1992) (Scalia, J., concurring).